Albert Conway, Off. Ref.
 

 This is an action brought by the Chiropractic Association of New York, Inc., on behalf of itself and its individual members and by Ernest E. Quatro, an individual plaintiff, against Herman E. Hilleboe, M.D., as Commissioner of Health of the State of New York. It is an action which seeks to enjoin and restrain the defendant as Commissioner and all persons acting under him or by his authority from preventing the members of plaintiff association and the individual plaintiff from operating for their individual use, ‘ ‘ in the practice of their
 
 profession
 
 as chiropractors, the X-ray equipment set forth in the complaint.” (Emphasis mine.) It also seeks generally to enjoin and restrain the defendant as Commissioner and all persons acting under him or by his authority from carrying out the provisions of regulation 19, as amended, of the New York State Sanitary Code, chapter XVI, thereof, insofar as they intend to enforce the aforesaid provisions against ‘
 
 ‘
 
 plaintiffs and other chiropractors practicing their
 
 profession
 
 in the State of New York.” (Emphasis supplied.)
 

 Chapter XVI of the Sanitary Code is entitled
 
 ‘1
 
 Ionizing Radiation ” and is composed of 19 separate regulations. We are concerned at the threshhold of our study with regulation 19, which reads as follows:
 

 ‘ ‘
 
 19. Limitations on application of radiation to humans.
 

 “
 
 No person shall apply radiation to a human being unless such person is licensed or otherwise authorized to practice medicine, dentistry, podiatry or osteopathy under the provisions of the Education Law of the State of New York. Radiation shall be applied by a licensed or otherwise authorized person to only those parts of the human body specified in tbe law under which such person is licensed or authorized to diagnose and treat.
 

 
 *556
 
 “ This regulation shall not prohibit the use of radiation by a technician, nurse or other person if such use is directed or ordered by a person licensed or authorized to practice medicine, dentistry, podiatry or osteopathy under the provisions of the Education Law of the State of New York.
 

 “ The sale, lease, transfer or loan of X-ray or fluoroscopic equipment or the supplies appertaining thereto, except to persons engaged in an occupation where such use is permitted and except to hospitals, infirmaries and medical and dental schools, institutions and clinics, is prohibited. However, this restriction shall not apply to persons intending to use such equipment and supplies solely for the application of radiation to other than human beings, nor to the acquisition of such equipment or supplies by wholesalers, distributors or retailers, in the regular course of their trade or business.”
 

 The Sanitary Code of the State of. New York has been adopted pursuant to Public Health Law, sections 220 to 229. Those sections comprise “ Title II — The Public Health Council.” Section 225 is entitled ‘
 
 ‘
 
 Public Health Council; Powers and Duties ”; Sanitary Code, subdivision 3, of section 225, reads as follows:
 
 “
 
 The public health council shall have power by the affirmative vote of a majority of its members to establish, and, from time to time, amend and repeal sanitary regulations, to be known as the Sanitary Code of the State of New York, subject to approval by the commissioner.”
 

 Subdivision 4 of section 225 provides for those matters as to which the Sanitary Code may deal and the provisions and regulations which it may establish, prescribe and contain.
 

 Public Health Law, section 229, entitled “ Sanitary Code, Violations, Penalties,” provides: “ The provisions of the
 

 sanitary code shall have the force and effect of law and the violation of any provision thereof shall constitute a misdemeanor, * * *
 

 Needless to say that the adoption of the Sanitary Code pursuant to legislative act was designed to protect the public health of our citizens and must receive a liberal interpretation in order to accomplish that result
 
 (People ex rel. City of Rochester
 
 v.
 
 Briggs,
 
 50 N. Y. 553;
 
 People ex rel. Ogden
 
 v.
 
 McGowan,
 
 118 Misc. 828, affd. 200 App. Div. 836;
 
 Matter of Stracquadonio
 
 v.
 
 Department of Health,
 
 285 N. Y. 93).
 

 Chiropractors are not licensed in the State of New York to practice any of the healing arts or, indeed, to do anything in our State.
 

 They are not regulated by any statute or supervised in their acts by any State agency. For at least each of the last 18 years
 
 *557
 
 chiropractors have sought from the Legislature of this State professional recognition. In each year such recognition has been denied.
 

 For many, many years past, partial professional status has been sought by chiropractors in the courts and in each case it has been withheld.
 

 In
 
 Strayer
 
 v.
 
 State Tax Commission
 
 (285 App. Div. 739) an attempt was made to have our courts decide that a chiropractor was exempt from the unincorporated business tax because he was engaged in the practice of a “profession.” Writing for the unanimous court, Mr. Justice Halpeku, then in the Appellate Division, Third Department, wrote that: “ * * * the judicial branch of government may not properly undertake to grant professional status to chiropractors by the backdoor by means of the interpretation of the exemption provision of a tax statute.”
 

 He also said at page 741:
 

 “ We do not find it necessary to attempt to draw the dividing line in deciding this case. When the Legislature enacted the unincorporated business tax law and granted the exemption therefrom to the enumerated professions and ‘
 
 any other profes
 
 sion’ (Tax Law, § 386), it must be deemed to have done so
 
 in the light of a long legislative history of the repeated rejection of bills seeking to give professional status to chiropractors in this State.
 
 Several such bills had been introduced in the Legislature in the years preceding the enactment of the unincorporated business tax law (see, for example, bills introduced in the years 1927 to 1933 [Sen. Int. No. 1457, Pr. No. 1688, 1927 Sess.; Assem. Int. No. 1730, Pr. No. 1981, 1928 Sess.; Assem. Int. No. 1384, Pr. No. 1930,1929 Sess.; Sen. Int. No. 625, Pr. No. 658, 1930 Sess.; Sen. Int. No. 361, Pr. No. 1839, 1931 Sess.; Sen. Int. No. 1708, Pr. No. 1943, 1933 Sess.]). None of these bills was enacted into law. We may therefore assume that when the Legislature in 1935 adopted article 16-a and the professional exemption therein contained, it did not intend that chiropractors should be embraced within the exemption provision.
 

 “ Chiropractors have, since 1935, continued to seek legislative recognition without success (see, for example, Sen. Int. Np. 778, Pr. No. 3240, 1955 Sess.).” (Emphasis supplied.)
 

 To the same effect is
 
 Matter of Oyer
 
 v.
 
 State Tax Comm.
 
 (3 A D 2d 632 [unanimously affirmed, without opinion 2 N Y 2d 942]).
 

 When we turn to the Education Law in Title VIII entitled “ Professional Practice,” we find in section 6501, subdivision 4,
 
 *558
 
 the definition of the practice of medicine. It is as follows: “A person practices medicine within the meaning of this article, except as hereinafter stated, who holds himself out as being able to diagnose, treat, operate or prescribe for any human disease, pain, injury,
 
 deformity or physical condition,
 
 and who shall either offer or undertake by any means or method to diagnose, treat, operate or prescribe for any human disease, pain, injury,
 
 deformity or physical
 
 condition.” (Emphasis supplied.)
 

 When in this State a man, whether he calls himself a chiropractor or something else, diagnoses the case of one who comes to him for help as requiring an X ray and either takes the X ray himself or sends the one seeking help to someone else to take the X ray, he is practicing medicine within the meaning of section 6501, subdivision 4, just quoted.
 

 In our case Quatro testified that when “a new patient” came to him, the patient would have complaints; that he made a patient’s history card for “ each new patient that he put on it the date the 1‘ patient ’ ’ consults him, his name, address, occupation and the “ comments he makes about his condition that he is coming in for ” (s. m. 219); the complaints the patient has then and is making to him; that he has treated children; their ages would not make any difference; he would ‘ ‘ treat ’ ’ a seven-year-old child, but is “not sure ” whether he ever “ treated ” a six-year-old child (s. m. 220). Quatro’s guilt of a violation of section 6501 is clear and by his own words.
 

 Education Law, section 6502, enacts into law the qualification for the practice of medicine in this State. It reads in part as follows: “ No person shall practice medicine, unless registered and legally authorized prior to September first, eighteen hundred ninety-one, or unless licensed by the regents and registered under article eight of chapter six hundred sixty-one of the laws of eighteen hundred ninety-three and acts amendatory thereto, or unless licensed by the department and registered as required by this article. *
 
 *
 

 None of the chiropractors who are members of the incorporated plaintiff comes within the provisions of section 6501 or section 6502 nor does the individual plaintiff.
 

 . Returning again to subdivision 4 of section 6501 of the Education Law quoted
 
 supra,
 
 I quote from
 
 People
 
 v.
 
 Maybrook
 
 (276 App. Div. 192, affd. 301 N. Y. 637) as follows: “ * * * numerous persons were examined and treated by defendant for various ailments, such as backache, headache, arthritis, heart condition, hay fever and asthma. Defendant, according to the
 
 *559
 
 proof, for fees paid, undertook to cure or alleviate the conditions complained of by adjustment and manipulation of the spine. That the treatments by the defendant were, in some instances, beneficial is wholly immaterial. Proof of specific acts to the effect that defendant was examining and treating persons for human disease is sufficient to sustain the count of unlawfully practicing medicine within the meaning of the statute (Education Law, art. 131, secs. 6501, 6502;
 
 People
 
 v.
 
 Vandecarr,
 
 260 App. Div. 912, affd. 288 N. Y. 640;
 
 People
 
 v.
 
 Scallon,
 
 274 App. Div. 783, affd. 298 N. Y. 805;
 
 People
 
 ex rel.
 
 Bennett
 
 v.
 
 Laman,
 
 277 N. Y. 368).”
 

 In
 
 People
 
 v.
 
 Kightlinger
 
 (301 N. Y. 639, affd. 276 App. Div. 230) four of the faculty members of the Chiropractiee Institute of New York were indicted for violating section 224 of the Education Law. In the Appellate Division at page 234 the court wrote:
 

 “On adequate factual proof showing that defendants in the respective records in question were actually diagnosing and treating human diseases, the courts have frequently held that unlicensed practitioners of chiropractic are subject to penalties for the illegal practice of medicine
 
 (People
 
 v.
 
 Scallon,
 
 274 App. Div. 783, affd. 298 N. Y. 805 (1st Dept. 1948);
 
 People
 
 v.
 
 Ellis,
 
 162 App. Div. 288 (2d Dept. 1914);
 
 Wendel
 
 v.
 
 Board of Regents,
 
 275 App. Div. 661;
 
 Brown
 
 v.
 
 Shyne,
 
 242 N. Y. 176, 178). The Court of Appeals in
 
 People ex rel. Bennett
 
 v.
 
 Laman
 
 (277 N. Y. 368, 384) sustained a complaint for an injunction to restrain a defendant, a chiropractor from practicing medicine unlawfully on the ground that the facts alleged showed that the unlicensed defendant therein would imperil the health of the people of the community.
 

 ‘1 Each case depends upon its own particular facts. This court in
 
 People
 
 v.
 
 Maybrook,
 
 (276 App. Div. 192) decided herewith, held that the mere use of the word ‘chiropractic’ or ‘chiropractor’ in an advertisement is not in and of itself, without further proof of what the person actually
 
 does,
 
 sufficient to sustain a count in an indictment charging unlawful practice of medicine. In that same case, however, on the basis of Grand Jury minutes factually showing what the defendant therein actually did, we reinstated the first count charging the defendant with unlawfully practicing medicine without authorization. In the case before us the first count of the indictment is based not on the mere use of the words ‘Chiropractic Institute’ but on corroborative proof in the Grand Jury minutes, read with the catalogue, all of which shows that the school and defendants, as its principal officers
 
 *560
 
 and teachers, held themselves ont to teach the students attending therein the diagnosis and treatment of human diseases with a view to a cure, and, accordingly, held themselves out as a school of ‘medicine’ within the meaning of subdivisions 1 and 3 of section 224 of the Education Law. As the school was concededly unlicensed, sufficient was shown to support the first count herein. ’ ’
 

 I am now going to quote partially the testimony of Quatro from the minutes beginning at page 192. I am assuming that Quatro was thought by the corporate plaintiff to be the best it had to offer as the individual plaintiff.
 

 Mr. Quatro was asked the following questions by the Assistant Attorney-General and gave the following replies:
 

 “ Q. As a party plaintiff in this litigation, do you recall that on June 18, 1959, at Albany, New York, I examined you before trial? A. Yes, sir.
 

 “ Q. There are, are there not, seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae? A. Yes; correct.
 

 “ Q. In the course of my questioning is it satisfactory to you if I refer to the cervical vertebrate as ‘C,’ the thoracic vertebrae as ‘T’ and the lumbar vertebrae as ‘L’? A. Yes, sir.
 

 “ Q. In the course of your practice when you adjust the vertebrae, the cervical vertebrae, at 0-2, why are you doing it? A. To correct a malpositioning of C-2 (s. m., pi 192).
 

 ‘ ‘ By the official referee:
 

 “ Q. You were asked about the 0-2 vertebrae on June 18,1959, were you? “ Witness: A. Yes, sir.
 

 ‘ ‘ Q. And you gave an answer? A. Yes, sir.
 

 “ Q. Do you remember what your answer was? A. Not exactly; but I could give an answer. It would probably be the same (s. m., p. 193).
 

 “ By the Assistant Attorney-General:
 

 “ Q. Well, then, reading at page 96 of your examination before trial, as party plaintiff, on June 18, 1959, were you asked these questions and did you make these answers?
 

 “ ‘ Q. Let us take all the levels or places there is interference. Tell us all the levels and all the places of interference. A. It doesn’t matter, they all go some place.’
 

 ‘ ‘ By the Attorney-General:
 

 “ Q. Were you asked that question and did you make that answer? A. Would you read the complete question again Mr. Murphy, please.
 

 “ Colloquy.
 

 
 *561
 
 “ By the Attorney-General:
 

 “Q. Were you asked this question and did you make this answer ?
 

 ‘1
 
 Question by official referee:
 

 ‘‘ Let us take all the levels or places there is interference. Tell us all the levels and all the places of interference. A. It doesn’t matter. They all go some place.
 

 “ Q. Were you asked that question and did you make that answer? A. Apparently it is-
 

 ‘1
 
 The official referee:
 

 “You may have been correct; you may have been incorrect; but the question is, were you asked that question and did you make that reply, on June 18,1959?
 

 “ The witness: I made the reply, your Honor, but it may have been —
 

 ‘ ‘ By the Assistant Attorney-General:
 

 ‘‘1 move to strike it out-
 

 *1
 
 The official referee: He said he made the reply.
 

 “ Q. Were you asked the question to which you made that reply and which has been read by counsel to you now?
 

 “ The witness: Well your Honor there may be more background before this question that he read. Actually, that is not a true question.
 

 “ The official referee: How about the answer; is that a true answer?
 

 “ The witness: Yes, it is, sir (s. m. 196).
 

 ‘ ‘ By Assistant Attorney-General:
 

 “Q. Were you asked this question, and did you make this answer:
 

 “ ‘ Q. Let us go down from C-2 to C-3. You treat the subluxation at C-2 because it is doing whatnow tell me. A. I adjust the subluxation at C-2 because it is a subluxation that is creating nerve interference. That is the only way.’
 

 “ Q. Were you asked that question and did you make that answer? A. Yes, Mr. Murphy.
 

 “ Q. Were you asked this question and did you make this answer:
 
 ‘
 
 Q. Whereabouts? ‘ A. At the nerve trunk where the nerve emits from the intervertebral foramen. That is what I am trying to correct’(s. m., 197).
 

 “ Q. Were you asked that question and did you make that answer? A. Yes, Mr. Murphy.
 

 “ Q. Were you asked this question and did you make this answer:
 

 
 *562
 
 “ ‘ Q. Out to what organs of the human body from C-2? A. I am not familiar with all of them, I don’t know where what fibers go.’
 

 “ Q. Were you asked that question and did you make that answer? A. Yes. I think I tried to qualify it but I was not allowed to.
 

 ‘ ‘ By the Assistant Attorney-General: I move to strike out
 
 ‘
 
 I tried to qualify it, but was not allowed to. ’
 

 “ The official referee: Read the next question and answer. Maybe he did.
 

 u
 
 By the Assistant Attorney-General: Yes, your Honor.
 

 ‘ ‘
 
 By the Assistant Attorney-General:
 

 “ Q. ‘ Q. You find the subluxation at C-3, so you adjust that, but why do you adjust it? A. Because it is creating nerve pressure at the C-3 level. ’
 

 “
 
 Q. Were you asked that question and did you make that answer? A. Yes (s. m., p. 198).
 

 “ Q.
 
 ‘
 
 Q. At the C-3 level it is creating nerve pressure and is interfering with the flow of nerves going out to what organs in the human body. A. Several organs.’
 

 “
 
 Were you asked that question and did you make that answer? A. Yes.
 

 “
 
 Q. ‘ Q. What are some of them? Give me one of them from C-3. A. I don’t remember.’
 

 “ Q. Were you asked that question and did you make that answer? A. Yes.
 

 “ Q. Were you ask this question and did you make this answer:
 

 “ ‘ Q. Give me one of them, in the human body being affected or allegedly affected. Give me one of them from C-2. A. I would have to check to find out exactly.’
 

 11
 
 Were you asked that question and did you make that answer ? A. Yes.
 

 “Q. Were you asked this question and did you make this answer (s. m., p. 199).
 

 “ ‘Q. You find a subluxation in C-4 and you manipulate it because it creates nerve interference at that point and interferes with the nerve supply out to what organ or organs of the human body? ”
 

 1 ‘
 
 And did you answer: A. I correct the distortion in C-4 or alleviate the nerve pressure at C-4? ’
 

 A. Yes.
 

 “
 
 Q. ‘ Q. And you alleviated at C-4 because of the fact that the nerve supply is being interfered with to what organs? ’
 

 “
 
 ‘
 
 —meaning of the human body.
 

 
 *563
 
 “ ‘ A. I correct the disfunction at C-4 to correct the disfunction for that reason alone. ’
 

 11 Did you make that answer ? A. Was that word disfunction, ’ Mr. Murphy ?
 

 “
 
 Q. Yes. A. Both were disfunction?
 

 “ Q. Yes, sir.
 

 “ Were you asked that question and did you make that answer ? A. I did.
 

 “ Q. ‘ Q. And nerve interference? A. At C-4.
 

 “ Q. Out to what organs from C-4 (s. m., p. 200). A. Whichever organs C-4 takes care of.’
 

 “ Were you asked those two questions and did you make those two answers? A. Yes (s. m., p. 201).
 

 “ By the Assistant Attorney-General:
 

 “ Q. ‘ Q. Can you tell me one? A. I would have to look them over. ’
 

 “ Were you asked that question? A. Yes.
 

 “Q. Were you asked these questions and did you make those answers:
 

 ‘ ‘ ‘
 
 Let us take C-5: Will your answer be the same to C15 ? A. Yes.
 

 “ ‘ Q. You could not give me the names of the organs that the nerve coming out of — it reads here 4-C, or brings back nerves from: Is that right? A. Yes.’
 

 “
 
 Were you asked that question and did you make that answer? A. Yes.
 

 “ Q. ‘ Q. Would your answer be the same to C-5? Yes.
 

 “ ‘Q. C-6? Yes.
 

 “ ‘ C-7?‘Yes.’
 

 “Were you asked those questions and did you make those answers? A. Yes, sir.
 

 “ Q. ‘ Q. And what is the next one as you go down, T-l? A. T-l.’
 

 ‘ ‘ Were you asked that question and did you make that answer ? A. Yes, sir.
 

 “ Q. Were you asked this question and did you make this answer:
 

 “ ‘Q. Do you know what — assuming you found a misalignment or subluxation in between C-7 and T-l, and you wanted to correct the nerve interference there, do you know what organs are fed by that nerve line that will, according to your theory, be interfered with? Would you know now? ’ A. No, I would have to check.’
 

 “ Were you asked that question and did you make that answer? A. Yes.’
 

 
 *564
 
 “ Q.
 
 i
 
 Q. by checking you would have to look it up in anatomy? Yes.’
 

 “ Attorney for plaintiffs:
 

 “ In the anatomy.
 

 “Assistant Attorney-General: Withdrawn. I will read it again.
 

 “ Q. * Q. by checking, you would have to look it up in the anatomy? A. Yes.’
 

 ‘ ‘ Were you asked that question and did you make that answer ? A. Yes, sir.
 

 “ Q. ‘ Q. Going down through T-2, T-3, T-4, T-6, would your answer be the same? A. Yes.’
 

 “ It would be the same? A. Yes, sir.
 

 “ The referee: That was your answer, ‘ Yes ’?
 

 “ The witness: Yes, sir.
 

 “ Q. ‘ Q. That you wouldn’t know, what terminal organs were being blocked or what terminal organs were being acted or reacted upon? A. Not in those specific places in those specific spots.’
 

 “ Were you asked that question and did you make that answer? A. Yes, sir.
 

 “ Q. ‘ Q. Would your answer be the same as to T-10, T-ll and T-12, that you would have to look it up; that you do not know? A. I think you just went through these.’
 

 “ Apparently I hadn’t, but would your answer, as of that date, have been the same? A. Yes, sir.
 

 “ The referee: Namely, that you would have to look it up in the anatomy?
 

 “ The witness: To find a complete distribution in each one of those nerves, yes, sir.
 

 “ The official referee: You added the word
 
 ‘
 
 complete ’; you didn’t use that word when you were being examined.
 

 ‘1 The witness: He asked for all of the organs supplied by the particular nerves.
 

 “ The referee: I didn’t hear him do that. I say — if you will answer my question, you have added the word
 
 ‘
 
 complete ’ now, but you didn’t add it when you were being examined on June 18, 1959?
 

 “The witness: He asked the question, and wanted to know the distribution of each one of those nerves, and I wasn’t able to tell him, your Honor.
 

 “ The referee: You didn’t know?
 

 ‘1
 
 The witness: No, I didn’t.
 

 “ The referee: Aren’t you supposed to know when you are treating patients?
 

 
 *565
 
 ‘ ‘ The witness: The complete-
 

 “ The referee: No. Aren’t you supposed to know?
 

 “ The witness: No, your Honor.
 

 “ rl'hc referee: How old are you?
 

 “ The witness: Thirty-one, your Honor.
 

 “ The referee: Go ahead.
 

 “ By the Assistant Attorney-General:
 

 “ Q. Were you asked this question and did you make this answer:
 

 “ 1 Q. What about L-l, 2, 3, 4, 5. A. Would be the same.’
 

 “ A. Tes, sir.
 

 1 ‘ Q. Do you remember the figure of 119 full spine X-rays and 11 cervical X-rays totalling 130? A. Tes, I recall it.
 

 “ Q. What were those? A. What were what, Mr. Murphy?
 

 “ Q. What were those full spinographs? What were they X-rays of? A. They were X-rays of the full spine and pelvis.
 

 “ Q. Taken of whom? A. Of my patients.
 

 “ Q. Over what period of time? A. I believe it was January, 1957, until June, 1959. I am not positive.
 

 “ Q. That is approximately correct. So that between the period of January of 1957 and June of 1958 you had taken 119 full spine X-rays and 11 cervical X-rays; is that correct? A. Yes.
 

 “ Q. At that time were you asked this question, and did you make this answer-
 

 “
 
 1
 
 Q. Very well. Now, would you be able to tell me approximately how many of those cards carry two exposures or three exposures? A. I would say roughly that —
 

 “ ‘ Q. These are just approximate figures. How many have two exposures? A. Roughly I would say that maybe one-fourth of them have two exposures.’
 

 “Were you asked that question and did you make that answer? A. Yes, sir.
 

 “ Q. These two exposures that would appear on a particular card meant that you had X-rayed that particular patient whose particular card it was twice? A. Yes, there were two exposures.
 

 “ Q. Two exposures? A. Of different parts of the body. It wouldn’t necessarily be two spine exposures on one card.
 

 “ Q. Then again there might be? A. It is possible.
 

 “ Q. Do you happen to have those cards with you here to-day? A. No sir, I do not.
 

 “ Q. As of the date of that examination you were using a Fisher X-ray unit, were you not? A. Yes, sir.
 

 “ Q. Are you still using the same unit? A. Yes, sir.
 

 “ Q. Are you still X-raying patients? A. Yes, sir.
 

 
 *566
 
 “ Q. In about the same volume, of approximately a hundred to 119 X-rays over a two-year period? A. Yes, I would say so.
 

 “ Q. Has it increased any, let us say, as your practice has augmented? A. I wouldn’t be able to give you exactly the increase, if any. It would be about the same.
 

 “ Q. As of August, 1958, you were using no cone on your X-ray machine, were you? A. That’s correct.
 

 “ Q. Where did you purchase this X-ray machine? A. I purchased it in Rochester from a retiring chiropractor. In fact he was dead at the time. I bought it from his wife.
 

 “ Q. You purchased it in what year. A. It was early in 1954.
 

 “ Q. What year model was that Fisher machine? A. 1932?
 

 “ Q. 1932? So that as of 1958 it would have been approximately 26 years old? A. Yes, sir.
 

 “ Q. Were you aware of the fact that as of the time you were taking these 119 spinographs and hitting by X-ray radiation the lumbar and sacral regions of the human body that you were of necessity radiating the gonads of both the men and the women? Were you aware of that? Now, that could be yes or no. Were you aware of it? A. Yes.
 

 “ By Assistant Attorney-General: With the permission of
 

 the court I will read from the examination before trial of this witness, your Honor, page 26:
 

 ‘ ‘ By Assistant Attorney-General:
 

 “ Q. Were you aware as of the time you were radiating the lumbar and sacral region along with the rest of it that I have referred to and radiating the gonads; were you aware of the very great danger that is attached to any kind of radiation of the direct primary beam or scattered that hits the gonads of either the man or the woman? ” (The word [scattered] above should read
 
 scatter.)
 

 “By Assistant Attorney-General: Now follows colloquy of counsel.
 

 “ By attorney for plaintiffs: I think it should be read, your Honor. I objected to that question and it was left to the court to determine whether that was a proper question.
 

 “ The referee: Did you receive an answer to it?
 

 “Assistant Attorney-General: Yes, I did. Judge.
 

 “ The referee: Read the answer.
 

 ‘‘
 
 Assistant Attorney-General: “I was not aware at that time of the very great danger. ’
 

 ‘1 By attorney for plaintiffs: Where is that, please?
 

 “ Assistant Attorney-General: Page 30.
 

 
 *567
 
 ‘‘ By Assistant Attorney-General:
 

 “ Q. Were you asked that question and did you make that answer? A. Yes, I made it over the objection of counsel.
 

 ‘
 
 ‘
 
 The referee: What had the objection to do with it? Did you make the answer.
 

 “ The witness: Yes sir.
 

 “By the official referee: You had on a lead apron, didn’t you?
 

 “ The witness: No, I didn’t.
 

 “ The referee: You never had one?
 

 “The witness: No.
 

 “ The referee: Did you ever hear of a lead apron?.
 

 “The witness: Yes.
 

 “ The referee: Go ahead. I was going to ask you if you
 

 had it, a lead apron. That, of course, is to protect the taker, the one who takes.
 

 “ The witness: I see. I stand behind a lead shield.
 

 “ The referee: I thought you said that-
 

 ‘ ‘ The witness: I thought you meant an apron for the patient.
 

 “ The referee: No. The lead apron is for your protection?
 

 ‘1 The witness: Yes.
 

 “ The referee: And you use it?
 

 “ The witness: Yes.
 

 “The referee: So, you must have known there was some
 

 danger in taking X-rays, danger to the patient?
 

 ‘ ‘ The witness: Yes, sir, your Honor.
 

 “ By Assistant Attorney-General.
 

 “ Q. And that danger or potential danger would be one of the reasons you, yourself, would get behind that lead screen so that you wouldn’t even be hit by any of the scatter; isn’t that so? A. Yes, sir.
 

 “ Q. To say nothing of being hit by the primary beam? A. Yes, sir.
 

 “ Q. Now, again, and from that time, the date of that examination down until to-day, when you take this same number of approximately 119 exposures, you get behind that lead shield? A. Yes, sir.
 

 “ Q. So that you, yourself, are endeavoring to insulate yourself, in so far as it humanly possible to do so, from any of that scatter? A. Yes, sir.
 

 “ Q. What is the primary beam? A. That is the beam that is coming out of the middle of the X-ray window, or the exposure port.
 

 
 *568
 

 “
 
 Q. Again bearing in mind this date of June 18, 1959, and prior thereto, during your chiropractic practice did you use a sphygmomanometer? A. Yes, I did.
 

 “ Q. What is that instrument? A. It is an apparatus used to determine blood pressure.
 

 “ Q. And you used it on your new patients? A. Yes, most of them.
 

 “
 
 Q. Most of them? A. Yes.
 

 ‘ ‘ By Assistant Attorney-General:
 

 “ Q. And it is done by wrapping a band around the arm above the elbow, pumping air into that bag, or compartment, and then observing what the dial reads attached to the instrument, is that not so? A. Yes, along with the use of the stethoscope.
 

 “ Q. Yes, that’s right. A. The stethoscope is used with it.
 

 “ Q. You testified, as I recall, that — and you correct me — I don’t mean to misquote you — but in the majority of cases that you did or did not note the blood pressure on the patient’s history card— A. I didn’t.
 

 “ Q. Didn’t. A. In the majority I didn’t.
 

 “‘Q. Do you ever use the stethoscope independent of the sphygmomanometer? A. Yes.’
 

 “
 
 Were you asked that question and did you make that answer? A. Yes, I did.
 

 “ Q. ‘ Q. What did you use it for there? A. Listening for chest sounds and listening for heart sounds.’
 

 “
 
 Were you asked that question, and did you make that answer? A. Yes, I did.
 

 ‘
 
 ‘
 
 By Assistant Attorney-General:
 

 “ Q. ‘ Approximately how many times a week in that last year have you used the stethoscope for any purpose? A. That would be a difficult question to answer, Mr. Murphy. I don’t really know.’
 

 “ Q. ‘ Approximately? A. Per week.’
 

 “ Q. ‘ Per week. A. I just — -don’t like to — How about thirty times ? I would say thirty times. ’
 

 “ Q. ‘ Over all thirty times per what, Mr. Quatro? A. Per week. ’
 

 “ Q. ‘ Thirty times per week you used the stethoscope? A. Yes.’
 

 “ Q. ‘ That would be for the purpose of detecting something about the patient, wouldn’t it? A. Yes.
 

 “ Q. Were you asked those questions and did you make those answers? A. Yes, sir.
 

 “
 
 Q. You use the blood pressure apparatus on every new patient, do you not? A. Yes.
 

 
 *569
 
 “Q. And you uso tiio stethoscope on every new patient? A. Nearly every new patient, yes, sir.
 

 11
 
 Q. Have you continued to use the blood pressure apparatus, the sphygmomanometer, on each of your new patients, from June of 1959 down to the present time? A. Yes, sir.
 

 “ Q. You have continued the practice? A. Yes, sir.
 

 “ Q. And have you continued to use the stethoscope on each of your new patients from June, 1959, down to the present time? A. Possibly not on all of them, but I have continued to use it, yes, sir.
 

 “
 
 Q. Your professor at Logan [Basic College of Chiropractic in St. Louis, Missouri] who taught you X-ray was himself a chiropractor, wasn’t he? A. Yes, sir, he was.
 

 ‘
 
 ‘
 
 Q. And you told me on the examination before trial, and do you tell me here to-day that to the best of your knowledge all of the other professors who taught the other subjects at Logan were chiropractors ? A. Yes, most of them were.
 

 “ Q. And there was no M.D.’s? A. No, sir, no M.D.’s.
 

 “ Q. As of June 18, 1959, and prior thereto your patient intake was about three per week, was it not? A. Yes, sir.
 

 “ Q. I think earlier, under direct examination, you testified that X-rays were taken of approximately 25 per cent of all new patients? A. No, 75 per cent.
 

 “ Q. I beg your pardon, 75 per cent. Did you testify on direct examination that you also take lateral exposures? A. Yes, I did.
 

 “ Q. Of the cervical, thoracic, and lumbar spine? A. Yes.
 

 “
 
 Q. At Logan you took a course in diagnosis, did you not? A. Yes, I did.
 

 “ Q. And it was called ‘ Diagnosis,’ wasn’t it? A. Yes, it was.
 

 “
 
 Q. What is diagnosis? A. It is the listing of symptoms, or a group of symptoms, and labeling them as a particular disease, the name of a particular disease.
 

 ‘ ‘
 
 Q. Taking a particular group of symptoms, taking them all together and giving that syndrome a label? A. Yes, sir.
 

 “ Q. Were you taught how to diagnose diabetes? A. Yes, sir.
 

 “ Q. But you do not use that in your practice? A. No, sir.
 

 “
 
 Q. You were taught how to diagnose heart trouble, were you not? A. Yes, sir.
 

 “ Q. But you do not use that knowledge in your practice? A. No, sir.
 

 “
 
 Q. You were taught how to diagnose kidney trouble ? A. Yes, sir.
 

 “ Q.
 
 But you do not use that in your practice? A. No, sir.
 

 “
 
 Q. Were you taught how to diagnose colitis? A. Yes, sir.
 

 
 *570
 

 “
 
 Q. And gall stones? A. Tes, sir.
 

 “ Q. And asthma? A. Yes, sir.
 

 “ Q. And appendicitis? A. Yes, sir.
 

 “ Q. And bronchitis ? A. Yes, sir.
 

 “ Q. And tuberculosis? A. Yes, sir.
 

 ££ Q. And spinal meningitis? A. Yes, sir.
 

 “
 
 Q. And pernicious anemia? A. Yes, sir.
 

 “
 
 Q. And myocardio infarct? A. Yes, sir.
 

 ££ Q. Do you know what that is? A. Yes, sir.
 

 “
 
 Q. What is it? A. It is a blockage of the blood supply to a part of the heart muscles.
 

 “ Q. Blockage of the blood supply to a part of the heart muscles? A. Yes, sir.
 

 “ Q. You were taught how to diagnose cancer? A. No, sir.
 

 “ Q. ‘No, sir? ’ A. Diagnosis of cancer? I was taught how it was diagnosed, yes, sir.
 

 “
 
 Q. Pneumonia? A. Yes, sir.
 

 “
 
 Q. Early tuberculosis? A. Yes, sir.
 

 “ Q.
 
 Brain tumor? A. Yes, sir.
 

 “ Q.
 
 With regard to this average of three new patients per week as of June, 1959, and prior thereto, is there any way, either from the examination of the spinograph, or any part of it, or the manipulation of the spine, as to whether or not — is there any way of your knowing whether any one of these patients had heart trouble ? A. No, sir.
 

 ££ Q. Or early heart trouble? A. No, sir.
 

 “ Q. Or actual kidney disfunction? A. No, sir.
 

 “ Q. Or early kidney trouble? A. No, sir.
 

 <£ Q. Or early disfunction? A. No, sir.
 

 ££ Q. Or early disfunction of the heart? A. No, sir.
 

 ££ Q. As to whether or not any of the average of those three patients a week had early colitis? A. No, sir.
 

 ££ Q. You made no determination? A. No, sir, I didn’t.
 

 ££ Q. Using the instrumentalities of manipulation of the spine and the spinograph, you used no other means of determination? A. No, sir.
 

 “
 
 Redirect examination.
 

 1
 
 £ By Attorney for plaintiffs:
 

 “
 
 Q. Mr. Quatro, in taking X-rays, do you use a filter for the protection of the patient? A. Yes, sir.
 

 ££ The referee: What is this filter that you say you use to protect the patient?
 

 ££ The witness: Yes, your Honor.
 

 ££ The referee: A filter?
 

 
 *571
 
 “ The witness: A filter, yes. It fits over the port or window on the X-ray tube, and it filters some of the radiation.
 

 “ The referee: Filters some of the radiation?
 

 “ The witness: It filters some of the radiation emitting from the tube.
 

 ‘ ‘ The referee: Is that what you meant by * filters some of the radiation? ’
 

 “ The witness: Yes, your Honor.
 

 “Recross examination by Assistant Attorney-General:
 

 “ Q. Do you remember on the examination before trial saying something about this Fisher machine you had leaking a little, the Fisher X-ray machine ? A. Yes, sir, I do recall, you asked me whether I knew whether the tube leaked or not, and I said I knew that it leaked. All tubes leak.
 

 “ Q. That is an oil-cooled- A. Leak radiation.
 

 “ Q. By ‘ leaking, ’ do we understand one another, you do not mean gives off radiation; that isn’t what you mean by leak, is it? A. No, not from —
 

 “ Q. Leaking is scatter, isn’t it? A. Yes.
 

 “ The referee: Leaking is what? Assistant Attorney-
 

 General : Scatter.
 

 ‘ ‘ Q. In addition to this primary beam of X-ray, whether it is an X-ray that you take or someone else takes, off in all directions in the room goes unseen scatter, to some extent? A. Yes, to some extent.
 

 “ The referee: Mr. Murphy, you asked him if something was missing from his X-ray machine. It sounded to me as though you used the word
 
 ‘
 
 cone ’ or ‘ cold. ’
 

 “Assistant Attorney-General: Cone (spelling), your Honor. Cone.
 

 “ The referee: What is the purpose of the cone on this Fisher X-ray machine ?
 

 “ The witness: The cone directs the beam more accurately and reduces scatter.
 

 “ The referee: You bought this machine from the widow of a man who owned it?
 

 “ The witness: Yes, your Honor.
 

 “ The referee: What year did you purchase it?
 

 ‘1
 
 The witness: Early in 1954.
 

 “ The referee: And it was a 1932 machine?
 

 “The witness: Yes, your Honor.
 

 ‘1 The referee: Without a cone ?
 

 “ The witness: Without a cone, your Honor, yes sir.
 

 
 *572
 

 “
 
 Q. And with an oil-cooled tube? A. No, with an air-cooled tube.
 

 “ Q. Air-cooled? A. Yes.
 

 “ Q. And it is the air-cooled tubes that tend to leak? A. Oil-cooled tubes leak, too, to an extent.
 

 “ Q. Do you mean to imply by that that the new and modern type of X-ray equipment that is purchasable today, for the last five years, if in proper working condition, leaks? A. I-
 

 “ Q. I would like an answer to that. Do you mean to imply that?
 

 “ The referee: Maybe he doesn’t know. Do you know?
 

 “
 
 The witness: In the last five years, no, I don’t. But I do know that it is possible for an oil-cooled tube to leak. It would not be out of the ordinary for it to leak.
 

 ‘ ‘
 
 The referee: This 1932 machine is thirty years old short of one year.
 

 Yes. 6 ‘ The witness:
 

 You “ The referee: machines ? do not know anything about the new
 

 “
 
 The witness: five years. Yes. Not the ones that were built in the last
 

 “ The referee: Very well. That is all?
 

 “
 
 Attorney for plaintiffs: No further questions.”
 

 I have quoted enough of the individual plaintiff’s testimony to indicate why I think he is and has been unlawfully practicing medicine
 
 (People
 
 v.
 
 Vandecarr,
 
 288 N. Y. 640;
 
 People
 
 v.
 
 Scallon,
 
 298 N. Y. 805).
 

 As to another of the witnesses who testified on behalf of the plaintiffs, Mr. Vincent P. O’Neill practices at No. 155 Pine Street, in Freeport. He graduated from high school and had one year at Brooklyn College. He studied at New York School of Chiropractic and graduated in 1939. He has been secretary of the plaintiff association. Pie has also been president for the two years permitted by its constitution.
 

 He uses X ray taken by the Precision X-Ray Laboratories operated by a chiropractor in the building where he has his office. He testified that he deemed it necessary in the course of his
 
 “
 
 practice ” to use X ray in the majority of cases and he felt that 80 to
 
 90%
 
 of his “ practice ” required it.
 

 lie said that there are a few over 1,000 members of the corporate plaintiff. All of the members either use their own X-ray equipment or send “ their patients out to a laboratory to have X-ray radiation applied.”
 

 
 *573
 
 The total number of chiropractors in New York State is approximately 2,300 or 2,400. Thus there are 1,100 to 1,200 chiropractors who are not members of the corporate plaintiff. Those men are, of course, completely without control.
 

 I shall now quote from Mr. O’Neill’s testimony:
 

 “Q. Mr. O’Neill, tell us the qualifications of membership of the plaintiff:
 

 The witness: May I consult the constitution so I have it accurately or do you prefer that I give it verbatim.
 

 “The witness: Article 8, section 1, shows that the membership is divided into four classes: Active membership, associate membership, student membership and honorary membership.
 

 “A candidate for active membership must be a resident course graduate of a chiropractic school or college
 
 and in active practice in the State of New York.
 
 He shall be of good moral character and a
 
 resident practitioner of recognized standing and ability in the State of New York.
 

 “The official referee: Bead that last part again — May I look at that?
 

 “ The witness: Yes, sir (the witness hands document to the referee).
 

 “ The referee: In active practice in the State of New York. I didn’t think you were admitted to practice in the State of New York.
 

 ‘ ‘ The witness: I think the mere fact that we are
 
 conducting our activities is a form of practice.
 

 “ The referee: You are not
 
 licensed to practice
 
 in the state?
 

 “ The witness: We are
 
 conducting our affairs.
 

 “ The referee: You
 
 may be doing it illegally; but active practice I didn’t think you tv ere permitted in the State of New York.
 

 “ The witness: Sir, I am at a loss as
 
 to what you call this,
 
 then.
 

 1‘ By Attorney for plaintiffs:
 

 “ Q.
 
 In the course of your practice is it necessary that you use X-ray,
 
 Mr. O’Neill? A. I believe that it is necessary, yes, sir, in the majority of cases.
 

 “ The referee: To do what? To accomplish what?
 

 “ The witness: The
 
 purpose of taking X-rays is to be able to determine the structural situation,
 
 the
 
 posture,
 
 the type of
 
 curvature,
 
 the
 
 spinal subluxations,
 
 the
 
 misalignments,
 
 or
 
 distortions
 
 that might be
 
 present in the vertebrail column.
 
 This gives us a great deal of information on how to proceed with the patient and it also shows us whether or not there may be any
 

 
 *574
 
 contra-indications to our type of therapy. (The American College Dictionary and the New Century Dictionary defines therapy as the treatment of disease, as by some remedial or curative process.)
 

 “ By attorney for plaintiffs;
 

 “ Q. In what percentage of your practice has it been your experience that it is essential to have X-rays? A. I would say
 
 about 80 to 90 per cent of my practice
 
 requires it.
 

 ‘ í qipg referee: That is for the purpose of determining what the man is suffering from?
 

 “ The witness: No, Sir; it is more for the purpose of determining the structural postural situation of the individual.
 

 “ The referee: That has nothing to do with the determination of what he may be suffering from?
 

 “The witness:
 
 Not necessarily.
 
 It does from the
 
 standpoint of manipulated therapy,
 
 but not necessarily does it show a specific symptomatology that
 
 the other healing arts
 
 use more predominantly in arriving at a decision.
 

 “The referee: Symptomatology-
 

 “ The witness: — would be the
 
 complaints of the patient.
 

 ‘i
 
 iji^g referee: "What was the word you used after “symptomatology? ” would you check it? (the reporter read from the record as requested.)
 

 “ The referee: What do you mean by ‘ not necessarily? ’
 

 “ The witness: For instance —- let me see. If a person complained of a headache the X-ray wouldn’t show that he had a symptom of the headache.” We are concerned primarily with-
 

 “The referee: We are now talking about ‘not necessarily.’ You said it did not necessarily show anything from which he suffered.
 

 ‘ ‘ The witness: What I say, the
 
 symptomatology that the other healing arts
 
 might place more emphasis on — for instance, spinal distortion wouldn’t necessarily show that the patient possibly had a temperature or a headache, or that he might be suffering with an acute pain in his belly at the moment; but
 
 it does give us structural information to enable us to proceed with our type of manipulation.
 

 “ The referee: And that is what you meant by ‘not necessarily? ’
 

 “ The witness: Yes, sir.
 

 ‘ ‘ By attorney for plaintiffs:
 

 “ Q. Did you tell us the percentage of cases in which the X-rays are necessary?
 

 ‘ ‘ The witness: I think 80 or 90 per cent.
 

 
 *575
 
 ‘ ‘ Q. And
 
 this X-ray used by you in your occupation is for detection purposes,
 
 Mr. O’Neill? A. Yes,
 
 for analysis and also detection,
 
 to determine, perhaps, if there might be some situation that should not be handled under manipulated
 
 therapy
 
 and should be referred to one of the
 
 other
 
 healing arts.
 

 ‘1
 
 By Assistant Attorney-General:
 

 “ Q. Do you happen to know what percentage, approximately, of that 563 do the same as you do, send their patients out to an X-ray laboratory to be X-rayed? A. I would say a hundred per cent, of them.
 

 “ Q.
 
 So that all of those
 
 1,000
 
 members are either applying X-ray radiation themselves in their offices, or sending their patients out to a laboratory to have X-ray radiation applied?
 
 A. I think that would be correct.
 

 “ Q. As one of the officers, secretary, et cetera, and finally president for two years of the plaintiff association did you come to know approximately how many chiropractors there are practicing in the State of New York, approximately? A. We had an unofficial survey made, I believe it was 1954, the first year that I took over as secretary, where we requested the yellow pages of telephone books from all over the state to be sent to us so we could make a compilation and try to get an idea of the total number of chiropractors, and as of that time — I can’t give you an accurate figure, but it was somewhere in the vicinity of 23 and 24 hundred.
 

 “ Q. Twenty three to 24 hundred plus or minus, we’ll leave it. A. Yes sir.
 

 The referee: As a matter of fact, a man can put out a sign “Chiropractor” on his door no matter what his education is and your association has no power to stop him from so doing?
 

 “The witness: That’s correct, sir. The regulatory status belongs with the state, not with us.
 

 “ The referee: You mean the State of New York?
 

 “ The witness: Yes, sir.
 

 “ The referee: The State of New York does not regulate chiropractors at all?
 

 ‘ ‘ The witness: If they regulate any of the healing arts —
 

 “ The referee.
 
 Chiropractic under the state law is not a healing art.
 

 “ The witness:
 
 I understand that.
 

 “ The referee:
 
 That is correct,
 
 isn’t it?
 

 “ The witness: Yes.
 

 “ The referee.
 
 So anybody can put out a sign and say he is a chiropractor and there is no control over them in the State of New Yorlc;
 
 that is correct, isn’t it Mr. O’Neill?
 

 
 *576
 

 “
 
 The witness: I think it is
 
 essentially correct,
 
 your Honor.
 

 “ Q. Of these six or seven that you send down to the Joseph Maynard Lab to be X-rayed per month in the year 1960 how many of those six or seven would the records of the Maynard Lab show were full spinographs? A. May I say that
 
 in the majority of cases I do ash for the full spinograph.
 

 “ The referee: Do you ever ask for anything else?
 

 “
 
 The witness: Yes, sir, sometimes I ask for cervical plates, neck plates.
 

 “
 
 The referee: Before you do that you must have treated the patient?
 

 “
 
 The witness: No sir. This is when I start with the patient that I request these things.
 

 “
 
 The referee: Before you give the
 
 patient any treatment?
 

 “
 
 The witness:
 
 In many instances, yes, judge.
 

 “
 
 The referee: In some instances-
 

 “
 
 The witness: In some instances I don’t.
 

 “ The referee:
 
 In some instances you do give the patient
 
 the treatment and then go down and ask for a cervical plate ?
 

 “
 
 The witness: In some instances, in a few instances I might do that, yes, sir.
 

 “
 
 The referee: It isn’t what you might do. Let us understand. If a man comes in to you, such as I, you can go down and
 
 say1
 
 Let me have a full spinograph. Now, in the case where a man comes in to you, or a woman, and in the first instance
 
 do you ever go down and ash for a cervical-graph without ever touching the patient?
 

 “
 
 The witness: Oh, no,
 
 I have palpated the patient
 
 and I have a
 
 pretty fair idea of what I want to start with.
 
 I don’t just make it a promiscuous thing, that they walk in and I immediately send them down.
 
 I chech with manual manipulation. I do chech the areas that are concerned.
 

 “ Q. Now, this full spinograph, what do you say the size of that plate would be? A. Fourteen by thirty-six (three feet).
 

 ‘ ‘ Q. And that would be the X-ray of the seven cervical vertebrae on the plate, and the twelve thoric vertebrae on the same plate, plus how many lumbar, seven ? A. Five lumbar.
 

 “ Q. Five lumbar on the same plate? A. Yes, sir.
 

 “ Q. How about the coccyx? A. The only time you run into that is when you have a person who is perhaps short enough where the fourteen by thirty-six will cover the area.
 

 “
 
 The referee: And if it doesn’t, if the person is too long to have the coccyx shown oil the fourteen by thirty-six plate, what do you do then?
 

 
 *577
 
 “ The witness: Unless the patient complains of a difficulty in that area I don’t bother with it.
 

 “ Q. Would this developed film that you receive back of a typical patient of these six or seven include any showing of the jaw bone or anything above the first cervical? A. It usually covers pretty much
 
 from the upper part of the cranium down.
 

 “ Q. So that roughly from about a third of the way down on the cranium from the top it covers from there down to the sacral area, depending upon the height of the patient? A. Roughly.”
 

 The witness apparently lawlessly has disregarded Education Law, section 6501, subdivision 4 (see
 
 People
 
 v.
 
 Vandecar,
 
 288 N. Y. 640;
 
 People
 
 v.
 
 Devinny,
 
 227 N. Y. 397, 401).
 

 There were other witnesses who testified for plaintiff. Of those, two were doctors of chiropractic; another was a doctor of philosophy as well as a doctor of chipropractic; another was a chiropractor from Chicago who was admitted to practice there under Illinois law; another was a teacher of physics “and in particular of radiation physics.” Each, except the one from Chicago and the teacher of physics, established to my satisfaction that he was practicing medicine in the State of New York where our Legislature has refused permission to do so, despite the efforts of chiropractors, in session after session of the Legislature, to obtain such permission. Each of them in testifying used words which might be termed “doctors’ or osteopaths’ words” since they were words involving terms used by medical men admitted in New York State to the practice of one of the healing arts as permitted by our Legislature. They surely were words which would cause the persons whom they described as “patients” and who came to them with “complaints” to believe that these men had competent medical knowledge. After talking with those patients either before treating them or after laying hands upon them to give so-called chiropractic adjustment or treatment, most of those people who claimed to be sick were sent off to another chiropractor, or a laboratory operated by a chiropractor, to have a complete spinograph from nearly the upper part of the cranium to the end of the spinal column with the consequent results depicted by Dr. Morgan and Dr. Glass. If the chiropractor consulted by such patient had his own X-ray machine capable of so doing, he took a complete spinograph himself. The spinographs were generally on a 14 by 36 (three feet) plate. In some instances an X ray of a portion or portions of the spinal column were taken — generally, but not always, in addition to the spinograph.
 

 Those other witnesses did not impress me as frank, truth-telling witnesses, with the exception of the chiropractor from
 
 *578
 
 Chicago. I shall digest the testimony of the teacher of physics, Grisewood, and make but brief references to that of Clarence W. Weiant, Sol Goldschmidt and Charles Krasner.
 

 The witness Weiant testified that he lived and practiced chiropractic in Peekskill, New York. He had not been licensed in any of the healing arts in New York State or City. He did have a degree of doctor of philosophy. He was dean of the Chiropractic Institute of New York, located on East Thirty-eighth Street, New York City. He has his own X-ray equipment at his office in Peekskill which has a value of approximately $2,500.
 

 He said that he took full spine A-P pictures and lateral cervical and lumbar views — but took the pictures in sections only because he did not have the equipment to take a full spinal X ray.
 

 Doctor of Philosophy Weiant was a difficult witness. He did not impress me as being frank. Certainly he was illegally practicing medicine in our State (s.m., pp. 172-176).
 

 Mr. Goldschmidt, who lives and has an office in Manhattan testified that he was chairman of the X-ray committee of the Chiropractic Association of New York; that certain questionnaires were sent out to the members of the corporate plaintiff and statistical information received in reply. The questionnaire, replies and the subsequent compilation of information based thereon were offered and received in evidence.
 

 The witness said that about half of the chiropractors, practicing in New York State, do not belong to the corporate plaintiff.
 

 Mr. Goldschmidt testified that after he sent a patient out to be X-rayed and the X ray came back, he read it and interpreted it and in part those readings and interpretations of that film so returned, entered into his deliberations and determinations
 
 “
 
 as to what manipulation to do on the patient.” Patients are X-rayed in a substantial part of his practice. He said that in the majority of cases he sent the patient out to have an X ray taken before he put his hands on him. He said he palpates his new patients. He also takes blood pressure and uses in his practice a sphygmomanometer, a stethoscope and an otoscope. However, he said he made no record of the data of what he observed upon his examinations on the patients’ history cards.
 

 The operation of this witness’s mind may be deduced from the following questions to him and his replies:
 

 “
 
 Q. Do you recognize that the sphygmomanometer and the otoscope and the stethoscope are instrumentalities for the practice of medicine? A. No, not exclusively, Mr. Murphy.
 

 “
 
 Q. You claim the chiropractors have the right to use them, also? A. I believe
 
 any member of the healing arts
 
 has a right to use them.
 

 
 *579
 
 “ The official referee: Chiropractic is not recognized as one of the healing arts in New York State, is it?
 

 “ The witness: That is correct, from a legislative standpoint, sir.”
 

 Apparently this witness does not know our theory of government with its division of powers and responsibilities or else is boldly lawless. Whether it be ignorance or lawlessness we may well be grateful to our legislators for protecting us and not licensing these men. Again, we must assume that the witnesses produced by the plaintiffs were the most learned, law-abiding and truthful men in the plaintiff association.
 

 Charles Krasner testified that he was a licensed chiropractor in the State of Vermont and in Puerto Eico. That before graduating from the Chiropractic Institute of New York, he was a graduate of Abraham Lincoln High School and attended Brooklyn College for two years; and that he has been a chiropractor for 12 years. That he owns X-ray equipment which he purchased in 1952 and which he described. That he usually takes a 14x36-inch full spine X ray with a lateral plate in 75% of his cases.
 

 He said that he used an otoscope to look into the ear and on occasion looked into the nose with it; that he used an ophthalmoscope to observe the eyegrounds, the eye disc, the retinal arteries; that he does not put down the results of his findings and observations from the use of the ophthalmoscope nor of the otoscope; that he listens to the heart with the stethoscope but not on all new patients; that he reads and interprets the X ray which he takes; that his teacher of X ray was another chiropractor and not an M.D.
 

 Certainly he was “holding himself out” as a medical practitioner.
 

 Again I call your attention to subdivision 4 of section 6501, of the Education Law quoted as follows:
 

 1 ‘
 
 The practice of medicine is defined as follows: A person practices medicine within the meaning of this article * *
 
 * who holds himself out
 
 as being able to diagnose, treat * * * or prescribe for any human disease, pain,
 
 *
 
 s *, deformity or physical condition, then who shall, * * * undertake,
 
 by any means or method,
 
 to diagnose, treat, * * * or prescribe for any human disease, pain * * * deformity or physical condition.” (Emphasis supplied.)
 

 Certainly the members of the corporate plaintiff and Quatro were holding themselves out as competent to cure disease within the meaning of subdivision 4 of section 6501 of the Education Law. Not only that, but the members of the corporate plaintiff and Quatro also violated the first and second paragraphs of
 
 *580
 
 regulation 19 of Chapter XVI of the New York State Sanitary Code.
 

 I desire also at this time to call attention to the title of Chapter XVI of the State Sanitary Code, of which regulation 19 is a part, which is 1 ‘ Ionizing Radiation ’ ’ and to regulation 1 which defines the terms ‘‘radiation” or “ionizing radiation” and the term “roentgen” in paragraphs (a) and (b): “ (a) The term ‘ radiation ’ or ‘ ionizing radiation ’ as used in this chapter shall refer to electromagnetic radiation (x-rays and gamma rays, &c.) or particulate radiation (electrons or beta particles, protons, neutrons, alpha particles, &c.) usually of high energy, but in any case it includes all radiations capable of producing ions directly or indirectly in their passage through matter, (b) The term
 
 ‘
 
 roentgen ’ (r) shall mean the quantity of x-radiation or gamma radiation such that the associated corpuscular emission per 0.001293 grams of air produces, in air, ions carrying one electrostatic unit of quantity of electricity of either sign. Milliroentgen (mr) equals 1/1000 of a roentgen.”
 

 That brings us to Mr. Edgar N. Grisewood, the nonchiropractor radiation expert called by the plaintiffs.
 

 Mr. Grisewood resides in Connecticut. He testified that he was a teacher of physics in one of our universities and had been such since 1923. He has no doctorate degree. He lectures in radiation physics and part of his work entails the calibration of X-ray machines, chiefly for dermatologists and on occasion for deep therapists at hospitals. He has been engaged in calibration for the last 10 years. He has been familiar with X-ray taking equipment and machinery for a number of years.
 

 At the request of counsel for the plaintiffs, during the week before the one in which he was testifying, Grisewood went to the office of a Mr. Krasner, a witness. Mr. Krasner took a full spinograph X-ray picture. He used a 36xl7-inch film and the subject of the film stood with his back against the bucky-grid — it was an anterior-posterior view. Grisewood was then asked this question by the attorney for the plaintiffs:
 

 “ Q. Did you, while you were present there, during the taking of that picture, make any test as to the radiation in any particular area of the person? A. I did. I put a Victoreen minometer in the groin of the patient during the exposure, and then measured the amount of scatter, the amount of radiation recorded by that chamber.”
 

 By the chamber he meant the chamber that was placed in the groin of the patient. The extent of the radiation as revealed on the Victoreen minometer was .09 r, and “ r ” being a standard unit for measuring radiation. He placed the ionization test
 
 *581
 
 ing device, which he had with him, in the patient’s groin and made the measurement himself.
 

 As we shall later see, when he returned to the stand three months later, the testing devices he used on this occasion was not capable of measuring an “ r ” unit — it was too small. It apparently measured only scatter.
 

 In the week preceding his testimony Grrisewood went also to the office of one, Dintenfass in Woodmere at the request of the attorneys for the plaintiffs. There he observed the taking of X-ray pictures by Mr. Dintenfass and in that instance also he placed the minometer in the groin of the patient and observed a negligible amount of scatter — a small reading but inconclusive— about .002 r. Dintenfass took several pictures. The second picture was an A-P (anterior-posterior) full spine. “ It was again a 14x36-inch picture.” He again placed the minometer in the groin area of the subject of the picture. He made his own reading of the minometer in the taking of the full spinograph and it showed “ 7/100 of an r.”
 

 He also went to the office of one Kimmel in Woodmere. There he saw Mr. Kimmel take two X-ray pictures. One was an A-P lumbar. The other was a lateral lumbar of the same patient. He did not place the minometer in the groin area of the patient because it was a woman and he asked her if she would place it and she did place it. After the picture was taken he made the reading of the minometer of the A-P lumbar picture and it registered .09 r.
 

 The witness then said that his memory was not good and he wished to correct the record as to the gonadal scatter for the first reading at Krasner’s office. He said he had testified without his notes and that it could be damaging because he gave it slightly more than 10 times what it was. It should have been .08 instead of .9. The reading of the lateral lumbar picture of the woman was .03 r. Grrisewood said that he was a radiation physicist and not a radiologist. He said he also went to the Chiropractic Institute on one occasion and observed certain pictures taken there. Some were A-P’s and some were laterals and some were full spinographs and some were partíais and there were others too. He observed the manner in which the pictures were taken and at that time and place made certain tests as to the extent of exposure in the gonadal area. He did that with the same instrument he had referred to previously, ‘1 a Victoreen minometer placed in the groin or crotch of the patient.” The first of the pictures was a lateral lumbar and it registered upon his ionization meter as .01 r; the second picture was an A-P lumbar and the meter registered 2/1000 of an r; the
 
 *582
 
 third picture was an A-P full spine and the extent of the exposure was .055 of an r; the fourth picture was another full spine done with a different technique with a slow film, where the first one had been with the fast film. The exposure recorded on the meter on that picture was 8/100 of an r. The fifth picture was a lateral full spine and the extent of the exposure on the meter was .02 r. The next picture was an A-P cervical and the extent of the exposure was not measurable. The next picture was a lateral cervical and the extent of the exposure was 4/ of an r. Then the equipment was changed and an A-P lumbar was retaken with the new equipment and the reading was .005 r. The last picture was a lateral lumbar with a reading of .001 r.
 

 On cross-examination the witness was asked for the size of the ionization chamber in cubic centimeters which he had used for his measurements. The witness answered “ this is the standard Victoreen 200 milliroentgen chamber, whose length is approximately three inches, and whose internal diameter is approximately one-quarter inch.” The witness was then asked to define the word ‘
 
 ‘
 
 groin ” as to precise location and he replied: ‘ ‘ I placed it between the legs as far up as it was possible to place it.” He said he saw the developed film in each of the cases as to which he testified except the last one. There he did not see the developed film. The two films taken by Kimmel were not taken while he was there. The witness said he would rather have seen a booth but no booth was used except that there was a booth at the New York Institute.
 

 The witness said he was not a medical doctor and he had had no schooling in a medical school as such.
 

 The witness Grisewood returned some three months later. He stated that he had been certified as a registered physicist for X ray and radium and the board which certified him was the American Board of Radiology which is constituted by the American Medical Association. He said that he had no right given him to take X rays. He was given the right to calibrate X-ray machines and check them. He used his home in Connecticut for his calibration. However, he goes to the various offices where the equipment may be in connection with his work including New York. He has been registered since 1958. He does not take X-ray pictures of humans.
 

 It was recalled to the witness by the counsel for the plaintiffs that he had testified concerning observing certain X rays being taken by certain chiropractors and making certain tests as to the amount of X-ray exposure to the patients being X-rayed. He was then asked to state the testing device or devices which he had used and the readings which he had taken in connection
 
 *583
 
 with his previous testimony. He answered
 
 ‘ ‘
 
 They were Victoreen minometer chambers used in conjunction with their standard electro meter gauge.” He indicated the chambers which counsel had in his hand and which were marked plaintiff’s exhibit 19 for identification. He was then given two tubular articles which had been marked plaintiffs ’ exhibit 19 for identification. He said
 
 ‘ ‘
 
 they are two small ionization chambers which are to be used for measuring of
 
 stray
 
 or
 
 scattered
 
 ionizing radiation, which may be x-radiation or gamma radiation.” He said that they were the testing devices which he used in connection with the figures he had given when he was last present at the trial. He said they were a standard testing device
 
 11
 
 for small amounts of stray and scattered radiation that it was common practice to use those instruments for measurement of stray and scattered radiation; that physicists in general would use them either as
 
 ‘ ‘
 
 pocket dosimeters for measuring the amount of radiation that they might receive during this work — ”; he was then asked who might receive such amount of radiation and he replied “ Anyone working with either isotopes or X or gamma radiation, in order to determine how much radiation they received in the course of their work; that one purpose for which the tubular devices might be used was to determine how much radiation had reached the one who was taking the X-ray picture ”; he said that another purpose for which they might be used would be, when placed in the room, to determine the amount of stray or scattered radiation at different points in the room. He said he used the measuring devices marked exhibit 19 for identification while the chiropractors were taking the pictures (s. m. 905).
 

 He was then asked:
 

 ‘ ‘
 
 Q. And tell us how you used them, whether you used them on the patient or where? A.
 
 They
 
 were placed in back of the patient or at the —- the region of the crotch — so as to determine the amounts of radiation received close to the genital organs or the gonads.”
 

 It will be remembered that when he first testified one week after the pictures were taken that he spoke of one measuring device. He was then asked referring again to Ex. 19 for
 
 id.:
 

 “
 
 Q. Do you calibrate them or check them for their accuracy from time to time? A. I do, Mr. Bouclc, yes. I check—
 

 “ Q. I am sorry. A. I check them against a standard Victoreen r-meter.
 

 “
 
 Q. And that is a larger instrument that you have at the — at New York University to check similar instruments like these
 
 *584
 
 Ex. 19 for
 
 id.
 
 minometers? A. I find it desirable to do so, yes ” (s. m. 907).
 

 It will be remembered that when he first testified he made no reference to a Victoreen “ r ” meter.
 

 He was later asked:
 

 “ Q. Professor, is it a fair statement to make that this Victoreen minometer is a better measuring device for scattered and stray radiation than it is for the direct primary beam? A. The direct primary beam would frequently be too much for this instrument to read correctly; yes.
 

 ‘ ‘ The official referee:
 

 “ So that your answer to his question is yes; isn’t it?
 

 “
 
 The witness: Yes.
 

 “ Q. The direct primary beam would send the instrument to its maximum and would not indicate the reading beyond that? A. That is right (s. m. 909).
 

 “ By counsel for plaintiffs:
 

 11 Q. And you were using two minometers ? A. That is right.
 

 “ Q. Were you? A. Yes.
 

 “ Q. And the one was placed in order to check the amount of dosage in the gonadal area, is that correct? A. That is right.
 

 “ Q. Where did you place the other one? A. The other one was placed behind the patient in cases where I could make a reading there.
 

 “ Q. And in what beam was that placed for a reading? A. These were the primary beams in that case.
 

 “
 
 Q. In other words, the amount of — the amount of power being used was such that as to the primary beam you could take a reading with the minometer, is that correct? A. It was in those cases.
 

 “ The official referee: You mean you could take with that minometer a reading of the amount of X ray directed at the patient?
 

 ‘1 The witness: In certain cases I could, yes.
 

 ‘ ‘ The official referee: What cases ?
 

 “ The witness: These cases where I had the minometer in back of the patient and they were taking the pictures at that time.
 

 ‘ ‘ The referee: That would tell you the amount of X ray directed at the patient?
 

 1
 
 ‘ The witness: In the cases where it was readable, yes. It was not readable in all cases.
 

 “ The referee: Why wasn’t it readable in all cases?
 

 ‘ ‘ The witness: Because the level was above the level of the minometer.
 

 “ The referee: That is what I thought.
 

 
 *585
 

 11
 
 The witness: * * #
 
 the amount of r-units reaching the front of the patient I would not know.
 
 (Emphasis supplied.)
 

 “ The referee: If the patient was turned around and it was directed at the back, you would not be able to tell what amount was directed at the back either, would you?
 

 ‘ ‘
 
 The witness: Not with a minometer. You must use another chamber for that purpose.
 

 “ The referee: We are talking about the minometer aren’t we?
 

 “ The witness: Yes, your Honor. And with a minometer you could not read it.
 

 “
 
 The referee:
 
 So you could never determine from the monometer, what the amount of X-ray was which ivas directed at the patient, is that so?
 

 “ The witness:
 
 Tour Honor, 1 agree
 
 —
 
 that is right, your Honor. The chamber will not read that high.
 

 “
 
 By attorney for plaintiffs:
 

 “
 
 Q. Well, Professor Grisewood, in relation to those cases that you testified to where you did give readings — in all those cases the readings were taken from the minometer. Is that correct? A. The readings of the scattered (scatter) radiation were from the minometer. Where the reading was made on the direct beam, it was made with a Victoreen r-meter and that required of course higher levels.
 

 “ The referee: You haven’t got the Victoreen r-meter here?
 

 ‘ ‘ The witness: I did not bring it with me, no, sir. I can produce one if you wish it.
 

 ‘ ‘ By attorney for plaintiffs:
 

 ‘
 
 ‘
 
 Q. But in making these tests Professor Grisewood, you did have a device to check the amount of X-ray exposure when you were making your check? A. Yes. There were two separate problems, Mr. Bouck, to check the amount of
 
 stray radiation or the
 
 amount of radiation which reached the gonadal region and to give you a reading of the direct radiation. As a matter of fact, the technique which the user employs will give a pretty good idea of the amount of radiation received. It is common practice to use machines which are well standardized. That wasn’t an issue in the question. You have the technique used in each case ” (s. m. 910).
 

 The testimony of Grisewood, as we have noted, was given on two occasions three months apart. On the first occasion, he talked of one minometer only. That was placed in the groin of the patient. When he was recalled three months later he testified to having two minometers. They were shown to him by counsel for the plaintiffs and they were marked at least for identification. Those two minometers were not capable of
 
 *586
 
 enabling the witness to determine the amount of X ray
 
 “ directed at the patient”
 
 The witness said so in his answer: “Your Honor, I agree, that’s right, your Honor. The chamber will , not read that high.” The truth was that the two minometers shown to the witness and marked for identification could measure only scatter. They were not strong enough to measure the direct beam directed at the patient. As the witness said on his second appearance, that would be made with a Victoreen r-meter and as he said “that required, of course higher levels.” It will be noted that on the second examination the witness for the first time spoke of a Victoreen r-meter. On his original examination he mentioned only “ a Victoreen minometer placed in the groin or crotch of the patient.” He also testified as I have pointed out heretofore: ‘ ‘ This is the standard Victoreen 200 milliroentgen chamber, whose length is approximately three inches,” and “whose internal diameter is approximately one-quarter inch.” The truth was, as the witness said on his first appearance, “ I put a Victoreen minometer in the groin of the patient during the exposure, and then measured the amount of scatter, the amount of radiation recorded by that chamber.” The truth appeared on this witness’s second examination. . He never tested for anything but scatter. He never tested for the direct radiation from the beam directed toward the patient.
 

 I find that the reason for the second appearance of Mr. Grisewood and his testimony beginning at (s. m. 898) was the following testimony given by Dr. Morgan:
 

 “A. The testimony that I presented this morning was an antero-posterior spine film taken with conventional X-ray apparatus
 
 under
 
 recognized good techniques of to-day and with films and screens and other conditions also optimum in character and lead to an exposure dose of the patient of something of one Roentgen or a thousand milliroentgens. Now, in some notes that I took yesterday Professor Grisewood reported that with some studies which he made the exposure doses were of the order of one-tenth of these values. I, of course, was not present when Professor Grisewood made his measurements and hence can only wonder about the reasons why this testimony of actual measurements might be different from my testimony which also is based upon the actual measurements in practice and which, incidentally, is supported by tables of exposure dose values under conditions identical to those which Professor Grisewood cited, in the handbooks prepared by the national committee on radiation protection and published by the National Bureau of Standards. Now, one thing that the witness said yesterday was of interest to me because he said that he used a device called
 
 *587
 
 a Victoreen minometer and it has been my experience in the use of such an instrument that at the relatively high radiation intensity levels characteristic of those intensities used in the diagnostic X-ray field that the instrument tends to be unreliable and unreliable in the direction of yielding values which are less than proper values, than actual values. Now, it is speculation on my part that this may be the reason for the discrepancy, but in view of Mr. Murphy’s question I feel it proper to report my experience in this field, particularly where the experience not only of myself, but also of the scientists who prepared the material for the handbooks of the national committee on radiation protection was also at some variance to that of the witness yesterday.
 

 “ By Assistant Attorney-General:
 

 “
 
 Q. At any rate, Doctor Morgan, it has been your experience and observation and you have found that the Victoreen minometer is unreliable for the purpose of measuring accurately X-ray exposure, under the proper techniques, of one milliroentgen or up to ten? A. Tes, I can. The answer is yes. I think my testimony a moment ago stated that.”
 

 Before going on to consider the testimony given by the witnesses for the defendant, Dr. Herman E. Hilleboe, as Commissioner of Health of the State of New York, it would be well to pause to consider the increase in our knowledge as to ionizing radiation beginning with the year 1930 and will make more understandable the testimony of Dr. Morgan and Dr. Glass who were called as witnesses by the Attorney-General of our State.
 

 In the year 1930 Herman Muller discovered
 
 “
 
 that X-ray will produce mutations in the hereditary material” (s. m. 574). Muller was later awarded the Nobel prize for his discoveries. Then in 1945, on August 6 and August 9, atomic bombs were dropped on Hiroshima and Nagasaki in Japan. Later, experimental prototypes of the hydrogen bomb were detonated in 1951 and 1952 by our national government. In 1954 the hydrogen bomb advanced from the experimental stage to the status of a usable weapon and our national government exploded three hydrogen bombs during that year at its Pacific proving ground in the Marshall Islands (Enel. Britanniea Book of the Year 1955). The taking of X ray, the dropping of bombs over Hiroshima and Nagasaki and the explosion of hydrogen bombs, all produce ionizing radiation with similar effects upon the human body.
 

 These various events, beginning with Muller’s discovery in 1930, which I have listed in the preceding paragraph, all involving ionizing radiation, alerted the National Academy of Sciences
 
 *588
 
 and our health statutes affecting both our city and our State have been amended and our research has continued unabated.
 

 We now turn to the testimony of Dr. Morgan.
 

 Dr. Bussell Morgan, resident of Baltimore, Maryland, was called as a witness on behalf of the defendant. He testified that he was a physician who specialized in radiology; that he was professor of radiology at the Johns Hopkins University and radiologist-in-chief at the Johns Hopkins Hospital. As a professor of radiology he is the teacher of medical students at the university. He testified to his experience in medicine prior to becoming professor of radiology and radiologist-in-chief at the hospital in 1946. He is responsible for a substantial radio-biological program where among other subjects genetics is an area in which he is engaged. He is a member of the American Medical Association, the American Boentgen Bay Society, the Badiological Society of North America, the American College of Badiology, the American Physical Society, the Badiation Besearch Society.
 

 Dr. Morgan was shown defendant’s Exhibit A, which was a full spinograph reproduction of an X ray as the term was used by Mr. Quatro, one of the plaintiffs. It was a photograph shown in a magazine and Dr. Morgan, as an expert, testified that it was an anterior-posterior projection and that the milliroentgens needed to take a film of that sort was dependent somewhat on the size of the patient but for the average patient it would run at the level of about 1,000 milliroentgens. This same reproduction had been marked defendant’s Exhibit C on the examination before trial of defendant Quatro.
 

 If it were a lateral projection of the same spine, including the pelvic and lumbar area, there would be such a greater amount of tissue to be penetrated by the X-ray beam, that the exposure dose would be as much as 10 times greater.
 

 Dr. Morgan was then shown an exhibit, which was marked Exhibit D for identification. It was a reproduction on glossed paper of a lateral X ray of a full spine, including the lumbar and sacral areas. It was then marked Exhibit D in evidence.
 

 In both Exhibits A and D the reproductive organs or gonads were in the direct X-ray beam.
 

 I shall now quote from parts of the testimony of Dr. Morgan beginning at page 504. Dr. Morgan is an authority called from Johns Hopkins University by the Attorney-General of our State and it would certainly be better to take his words given as a witness under oath rather than for the court to attempt to paraphrase it:
 

 
 *589
 
 “ Q. Doctor, in any anterior-posterior X-ray film of the full spine, including the lumbar and sacral area, the gonads are going to be of necessity in the direct primary beam, are they not? A. Yes. In the case of a female this is eerlainly true. In the case of a male it is also almost certain.
 

 “ The referee: Almost certainly true?
 

 “The witness: Yes.
 

 “ Q. And for the production of a clear and adequate lateral view of the full spine, including the lumbar and sacral and coccyx area, the gonads of the male and female are in the direct primary beam of the X-ray? A. This is true.
 

 “ The referee: Did you ever hear of X-ray machines being made differently for chiropractors than for medical doctors?
 

 ‘ ‘ The witness: The X-ray generating equipment is, to my understanding, identical. There is no special characteristic concerning the X-ray generating apparatus.
 

 ‘ ‘ The referee: All right; go ahead, Mr. Murphy.
 

 ‘ ‘ By Mr. Murphy:
 

 “ Q. Dr. Morgan, what are X-rays? A. To answer this question, since this is a technical subject, it might be well to spend just a moment or two giving some preliminary information on this subject.
 

 “ The referee: You take that time to do it, or as much time as is needed.
 

 1 ‘ The witness: Thank you, your Honor.
 

 ‘ ‘ The world and universe in which we live, as you know, is made up of two primary components, matter, which is familiar to everyone — the seat in which I am sitting, the seats in the room, the walls — things which we can feel, touch, see — the material world.
 

 ‘ ‘ And then there is another fundamental component, and this is energy. Although energy may be defined in many ways, I suspect that perhaps one of the simplest definitions is one in which it is defined simply as that component of the universe which makes matter move. Without energy in this universe of ours all of the things which we see, feel, and touch would be absolutely stationary; there would be no motion.
 

 “ Now, because energy is closely related to the movement of matter in most forms in which it exists, it is bound up with matter in one form or another; and a typical example of this is the energy found in gasoline, which when burned causes our automobile to move. There is one form of energy which exists in nature which is free from matter, and this form is radiation.
 

 
 *590
 

 “
 
 The most familiar form of radiation, I guess to most of us, is the sunlight which falls on the earth from the sun, or the light from the light sources in this room.
 

 * ‘ The light as it comes to us from the sun or from the lights in this room comes in the form of myriads of little units of energy which are not from an analogous standpoint dissimilar to little droplets of rain coming down from clouds, except in the case of light the little units, the little bundles are energy rather than matter.
 

 “ Now, the amount of energy bound up in one of these little units, in the ease of light, is quite small, and if we assign, let us say an arbitrary, or a relative amount of energy equal to unity (i.e., assign a level of energy of one) to each of the little droplets of sunlight, or the light from this room, the amount of energy bound up in the little droplets which emerge from an X-ray tube are enormously greater — not ten times greater, not a hundred times greater, or a thousand, but fifty thousand, or of that order; in other words, a great deal more.
 

 “
 
 It is as a result of this markedly increased amount of energy that the properties of X-rays are substantially different from the properties of light, and one of the properties, of course, is that X-rays, unlike light, penetrate matter relatively easily. They do not penetrate matter with complete ease. Some of the X-rays projected through any material may be absorbed, and that energy converted into some other form of energy, which is like any other impact in nature, fundamentally destructive in nature.
 

 “
 
 But, to go back to the properties of X-rays in general, again, these X-rays can do many things because of this increased energy.
 

 1 ‘ One of the things which they can do, and which is important, is that they can ionize air or cause the molecules of air to be broken into two components, into electrons and a positive ion which is the remainder of the molecule which is left behind.
 

 “ Q. By virtue of their power of impact? A. By virtue of their power of impact and absorption.
 

 “
 
 Now, there are some similarities, however, between X-rays and light. The basic one, of course, being not only the fact that, from a physical sense, they are identically the same thing, but they also affect photographic emulsions, and are hence used in diagnosis of disease by the making of X-ray films.
 

 “
 
 Now, this I think is perhaps a fairly straight-forward definition and exposition of what X-rays may be.
 

 “ Q. And I believe you testified that they are of an order of fifty thousand times the force of light beams ? The individual
 
 *591
 
 units of energy are of this order? A. That’s right. A. You will understand, of course, that there are some X-ray beams in which the amount of energy is much greater than this.
 

 ££ Q. That is right. A. Some which is perhaps a little less.
 

 “
 
 Q. Now, it is the protons, or the radiation, which actually go right through the body tissue of the patient and land onto that film in back of the patient or on the side of the patient, that produce the picture on the film, is that so? A. The word is
 
 ‘
 
 photon.’
 

 “ Q. Photon? A. The word ‘ photon ’ is the name given by physicists to these little bundles of energy of which light and X-ray beams are composed.
 

 “ The referee: How do you spell photon?
 

 ££ The witness: P-h-o-t-o-n.
 

 ££ Q. In other words, Doctor, X-rays are ionizing radiation or energy in motion resulting from the collision of high energy electrons which strike a tungsten tube inside the vacuum of the X-ray tube thereby producing myriads of these electromagnetic waves or protons- A. Photons.
 

 “
 
 Q. —that are commonly spoken of as X-rays, is that true? A. Again the word is ‘ photons.’
 

 “ Q. Is that true ? A. This is true.
 

 “ Q. And then these myriads of photons emit through the window of the X-ray machine to strike the patient being X-rayed? A. This is right.
 

 11 Q. Many of those photons, as I understand it, that are commonly referred to as the soft rays, when they hit stay inside the patient? A. Yes. I might elaborate on this point—
 

 ‘ ‘ Q. Could I just ask this one more question, Doctor? A. Yes.
 

 “
 
 Q. Many of them stay inside and it is the photons that go through the patient onto the film that go through the bony structure and everything else and all of the cells, the human cells that are in their way, go right through that and land onto the film behind, that make the picture ? A. This is correct. To put this in perspective, it might be well to say just one or two more words about this.
 

 ££ When an X-ray beam is projected through a structure, and if that structure is a human being, it is the same situation, most of the X-ray photons are absorbed or scattered and are lost to the image-producing function of the beam. A few, however, pass through the structure and fall on the film. What is the relative numbers involved here ? It might be worthwhile to put this in perspective, to cite some of these.
 

 ‘£ In the case of an anterior-posterior film involving the abdomen, those photons which pass through the abdomen, about 99
 
 *592
 
 per cent, are absorbed or scattered, and only about 1 per cent, emerge on the other side for photographic purposes.
 

 “ When the patient is turned into the lateral view only about one-tenth of this number gets through: in other words, about 99.9 per cent, are absorbed and scattered.
 

 “ The referee: That is one-tenth of 1 per cent, gets through?
 

 1
 
 ‘
 
 The witness: That is true. That is correct.
 

 “ And of these photons which are absorbed the energy is usually liberated in the form of mechanical energy which remains within the cell in which the absorption takes place, there to cause damage and disturbance to the biological processes which are going on within that cell.
 

 “ It is the same sort of destructive action which occurs whenever uncontrolled energy is released within a structure which is not able to utilize that energy effectively.
 

 “ What happens to the scattered radiation? Well, some of it passes outside the body. Measurements, however, indicate that most of this, too, ultimately is absorbed by tissues before it is able to emerge from the body.
 

 “ Q. Doctor, the gonads are the reproductive cells, are they not? A. They contain the reproductive cells; that’s correct.
 

 “ Q. The gonads of the male are the testes and the spermatoza? A. The gonads of the male are the testes and contain spermatoza, among other cells.
 

 “ Q. And the gonads of the female are what? A. Are the ovaries and they contain ova in various stages of development.
 

 “ Q. In those gonads of the male and the female are contained the hereditary material from which the human beings in existence came, and from which the generations yet unborn are to come? A. That’s correct.
 

 ‘
 
 ‘
 
 Q. Doctor, do you agree that the hereditary material of the human race is one of the most precious trusts that we have in our care, and that it should be handed down from generation to generation in the best possible condition?
 

 ‘ ‘ Attorneys for plaintiffs :
 

 “
 
 I object to that as improper in form and prejudicial.
 

 “ The referee: Overruled. I will allow him to answer.
 

 “
 
 The witness: Yes, I do. This is an expression used by many people, particularly the geneticists who are primarily concerned with this important problem.
 

 ‘ ‘ By Assistant Attorney-General:
 

 “ Q. Doctor, do you have an opinion which you can express with a reasonable degree of radiological-genetic certainty as to whether or not X-rays passing through the gonadal organs of the male and female damage that hereditary material? A. I do.
 

 
 *593
 
 “ Q. Will you state what that opinion is? A. The effect of X-rays is destructive upon biological materials, and this is true whether the biological materials are cancer tissues, with which I do deal in my daily practice, or whether the material is normal cells composing the various tissues of the body, including the gonads. Now, of the various parts of the cell, regardless of gonadal tissue, cancer tissue, or the like, the most sensitive part to ionizing radiation, and the part most likely to undergo destructive change, is the nucleus which contains the chromosome material which determines in the case of the reproductive cells the characteristics of future generations, and radiation produces within these cells, thereby, by its destructive action, changes in this chromosome material which may materially affect the characteristics of future generations.
 

 “ These changes are almost always deleterious ones. The chances of the changes being deleterious, indeed, are so great that one can essentially neglect the possibility of the changes being beneficial, and hence, radiation exposure of gonadal tissue has to be a serious business whenever such exposure is carried on, and the damage created must be considered in relationship to the benefits to be achieved by that exposure.
 

 ‘ ‘ Q. What is your opinion as to whether or not X-ray exposure to the gonads of the order of 1,000 milliroentgens is damaging and deleterious, in part, at least?
 

 “ The witness: Well, the genetic information on this point 1 think is sufficiently clear to give an estimate of the damage which such a dose might produce. It is a fact of nature, as you perhaps know, that mutations are continually taking place in the genetic material of the human being, and that geneticists have stated that the number of mutations which are spontaneously taking place in nature are of something of the order of 2 per cent, fertilizations * * *.
 

 ‘1 The witness: This, therefore, leads us to the point, what does a thousand milliroentgens do as far as the creation of additional mutations within the genetic material, and here the genetic evidence is that an exposure dose of about forty roentgens to the reproductive organs will double the spontaneous mutation rate.
 

 “ In other words, a dose of forty roentgens would cause the percentage of mutations existing within the population to change from approximately 2 per cent, to the 4 per cent, level; and, proportionately, one roentgen, or 1,000 milliroentgens exposure doses, which are identical, would proportionately create an effect in changing the mutation rate upward.
 

 
 *594
 

 ‘ ‘
 
 By Assistant Attorney-General:
 

 “ Q. Changing it upward? A. That’s right.
 

 “ Q. By mutation the genes and chromosomes of the reproductive organs ? A. By causing changes within the genes, which would lead to mutations.
 

 “The referee: So that this milliroentgen — that means a thousand roentgens?
 

 “The witness: No, just the reverse. One thousand milliroentgens equals one roentgen.
 

 ‘ ‘ The court: I see.
 

 (‘ By Assistant Attorney-General:
 

 “ Q. And a dose of ten roentgens would increase by ten times — A. This is right.
 

 “ Q. —the mutations and changes in the genetic material? A. This is right, and not only this, but as additional exposures take place from time to time throughout the reproductive life of the individual these additional exposure doses are cumulative in the effect.
 

 “ Q. I am glad you brought that up, Doctor. In other words, the X-ray exposure that a patient has to the gonadal area, that a patient gets next month must be added to the dosage which he receives to-day — assuming he has received it? A. That’s right.
 

 “ Q. And that the dosage which they received six months — rather, that they will receive six months from now must be added in assessing its damaging and deleterious effect to the dosage received next month and received to-day, assuming the patient received it? A. That is right.
 

 “ Q. And ad infinitum? A. Right.
 

 “ Q. It is additive and cumulative; is that correct? A. That’s right.
 

 ‘ ‘ Q. Now, will you state in a little greater detail what happens to that chromosome when it is fractured by a photon? The chromosome — I am talking now of the reproductive organs. A. The influence of radiation absorbed within a reproductive cell, or other cell, for that matter, and specifically the radiation absorbed by the chromosome material of the cell may affect the chromosome in a number of ways.
 

 “ One way is the manner in which you have just asked the question, that is to cause an actual break of the chromosome material, the release of energy being so great and the destructiveness so great that a fracture will actually take place.
 

 “ Now, in addition to this sort of action, radiation also may not cause a mechanical destruction of a structure such as a
 
 *595
 
 chromosome, but may by the release of energy within it disturb the biochemical mechanism. That is a disturbance of the structure now at the macro-molecular level rather than at the gross level, to the extent that mutations will result from that action of radiation.
 

 “ And, so, some of these effects of radiation are directly visible if one puts the cells under a microscope, particularly at the dividing stage, where the chromosomes are separated and one can see them easily, and under these circumstances irradiated cells are seen to actually be fractured.
 

 ‘1
 
 But, in addition to these changes, as I say, and perhaps of equal importance, are the changes which are not visible directly, but which manifest themselves most dramatically, I suppose, in future generations, when abnormalities in the individual offspring show up.
 

 “ Q. Doctor, do you agree that for all practical scientific purposes that all mutations of those reproductive genes are dangerous and deleterious ? A. Yes, as I said early in this testimony, I agree with this.
 

 ‘ ‘ Q. And depending upon whether it is a male or female whose gonads are being X-rayed, that damage will occur to the sperm cell of the male or the ova of the female; is that correct? * *
 

 1 ‘
 
 Q. Dr. Morgan, I believe you have already testified that an X-ray exposure of the nature of a thousand roentgens — milliroentgens — will produce proportional damage and mutations to the gonads of either the man or the woman who happens to be the one exposed? A. Yes, the amount of damage to the reproductive cells from all of the scientific evidence at hand to-day is that the amount of damage is proportional to the quantity of radiation absorbed by the reproductive cells, and also not only is there a proportionality here, but that the relationship between the biological effect and dose begins from zero dose upward. In other words, there is no dose below which one is completely safe; there is no so-called safe dose. The effects produced by a small dose qualitatively are exactly the same as the effects produced by a large dose. The only difference here is a quantitive one; the relationship being one of proportionality.
 

 “ Q. In other words, there is no minimum amount of radiation which must be exceeded before damage and deleterious mutations occur? A. That is correct.
 

 “ Q. The more radiation the more mutations? A. That is correct.
 

 “
 
 Q. What is the fact as to whether or not of all of the bodily tissue the inheritance mechanism is the most sensitive to radia
 
 *596
 
 tion of any of the biological systems ? A. Well, scientific experiments have shown that the chromosome material of the cell is the most likely to be damaged by radiation.
 

 “ Q. If I gave yon a sheet of plain white paper, or yellow paper, could you sketch thereon for the court and for the record a normal reproductive cell, and then beside it, to the best of your ability, a damaged reproductive cell showing the chromosome damage ? A. Yes. I think it would be possible to do so, exhibiting the one type of process that I spoke of earlier, namely, the fracture of a chromosome and its appearance.
 

 “ Q. Doctor, what happens in the master plan when one of these genes or chromosomes that have been damaged by radiation exposure happens to unite in the process of human mating with an ova or sperm of the opposite sex? A. Well, a wide variety of things may result, all the way from the fertilized cell failing to reproduce itself and dying, on the one hand, all the way to the other extent wherein the cell develops through its normal processes and a child is born, and that child exhibits an abnormality of one sort or another.
 

 “ Q. Based upon your background in the subject, whether from reading or observation, or otherwise, can you state what some of these resultant abnormalities from the situation that I have described in my previous question and your previous answer, could be? A. Well, there are a wide variety of abnormalities which might result from such a mutation in the reproductive cell, and these abnormalities involve almost every system of the body, the cardiovascular system, the nervous system, bone and joint system, and so on, just to cite a few of some of these, the abnormalities of congenital heart disease, of which, as I said, there are many, abnormalities of the blood-forming tissues in which one or more of the chemical and cellular constitutents of the blood may be absent, abnormalities of the bony system with multiplication of an absence of certain of the normal parts of the body — almost every system can show abnormalities, and where these abnormalities will develop is a straight random process which might result in the abnormality appearing in one state in one individual and the abnormality taking another form in another individual.
 

 “ Q. These abnormalities are all harmful, are they not? A. Yes.
 

 “
 
 Assistant Attorney-General:
 

 “
 
 Q. Doctor, you will pardon me if, for the purposes of this record in black and white, I now try to get this down, let us say, to a sub-scientific semantic level. Let us assume — and we are
 
 *597
 
 always thinking about my last question and your answer to that question — let us assume a young lady of twenty-two years of age, now — based upon reasonable expectation and probabilities, what will be the balance of her reproductive life? A. It is variable ; it will run on an average to forty-five or fifty years of age. It may be a few years on either side of this.
 

 “Q. Assuming the figure of forty-five years, would that mean that that twenty-two-year-old girl still had twenty-three years more of reproductive life? A. That is right.
 

 ‘‘ Q. And in the course of that reproductive life there would be released from the ovaries approximately once each month to pass down through the uterine tubes a mature ova ready to be fertilized and conceived? A. Tes, a mature ova; that’s right.
 

 ‘ ‘ Q. Approximately twelve per year ? A. Approximately twelve or thirteen. The usual cycle is about four weeks.
 

 “
 
 Q. So that if we will multiply the twenty-three-year figure by twelve —
 

 ‘1 The referee: Thirteen. A period is usually about four weeks, I think you said?
 

 “ The witness: That’s right.
 

 “ Q. —by thirteen, that young lady will mature and pass down through the tubes for fertilization in the course of the balance of her reproductive life twenty-three times thirteen ovum for a total of 299 ? A. That is correct.
 

 “ Q. And that becomes larger or smaller as her reproductive period ends, sooner or later? A. That is right.
 

 ‘1 Q. Now, in answer to my question when I asked you whether or not at risk were not only the mature, the individual mature or maturing ovum that was present at the time she had that exposure of the full spine with a 1,000 milliroentgen exposure —
 

 “ Assistant Attorney-General: I will have to ask that that be read again, your Honor.
 

 “ The referee: Start over; that might be easier. All right, have it read, if you wish.
 

 “
 
 Assistant Attorney-General: I think I would like to have it read.
 

 “
 
 The referee: Would you please read it? (The court reporter read the question as thus far recorded.)
 

 ‘ ‘ By Assistant Attorney-General:
 

 “ Q (continuing). Now, this girl that I am speaking of, age twenty-two, with roughly 299 ovum yet to be passed in her reproductive life, at risk, in your opinion, is there not only the mature and maturing ovum, but all the other 298? A. All of the cells are at risk, of course.
 

 
 *598
 
 “ Q. And they are there in their primitive state. A. Bight.
 

 “ The referee:
 
 ‘
 
 Yes ’ is the answer ?
 

 “ The witness: Yes.
 

 “ Q. And that is a fact of genetic life, so to speak? A. Yes, all of the genetic evidence indicates that this is true.
 

 “ Q. In the case of the male-
 

 “ The referee: I am not so sure that I understand that. You mean that that might affect each or any of the 298 later — what would you call it?
 

 “ The witness: Ova.
 

 “ The referee: —during this period of her life up to fifty or fifty-five ?
 

 “ The witness: Yes, What is involved here, your Honor, is that radiation exposure has a certain probability of doing damage to the cell, and once the damage is done it remains, and even though that cell may be discharged, ten years, fifteen years later, it still is a damaged cell which by its damage will result in an abnormality of the offspring which may result from that cell.
 

 “ The referee: All right.
 

 “ By Assistant Attorney-General:
 

 “ Q. To close a possible gap in this record, in calculating the potential genetic damage of an X-ray exposure to the full spine, including the gonadal area, of 1,000 milliroentgens, would you say that at risk would be not only the mature sperm cells of the male and the ova of the female, but also of the primitive germ cells which are contained in the ovary and testes and will be released periodically throughout the reproductive life of the individual? A. Yes, that’s correct.
 

 ‘ ‘
 
 The referee: Your answer is
 
 ‘
 
 yes? ’
 

 “ The witness: Yes.
 

 “ Assistant Attorney-General: Your Honor, if I might perhaps make myself clear as to what I was endeavoring to do, as I said ‘ close the gap in the record,’ my previous question of almost identical wordage had to do with defendant’s Exhibit A. Now, this one is independent of it.
 

 “ rppe referee: Independent of Exhibit A?
 

 “Assistant Attorney-General: That is right.
 

 ‘
 
 ‘
 
 By Assistant Attorney-General:
 

 “ Q. And in the case of a lateral exposure to the same area by approximately how much would the resultant damage be increased? A. In an amount proportional to the increase in dose. As I testified earlier this morning, these doses are larger than used in an A-P projection and under some circumstances is increased to as much as ten times.
 

 
 *599
 
 “ The referee: What kind of projection is that?
 

 “The witness: Lateral projection — side to side.
 

 “ Q. What does the phrase ‘ at risk ’ mean? Is ‘ in danger ’ a comparable one? A. ‘ In danger? ’ ‘ Likely to be damaged ’ is, I think, perhaps a good definition.
 

 “ Q. Now, in the case of a young man of twenty-one exposed full spine, including the gonads, to a thousand milliroentgens of radiation, would there be at risk not only the male spermatozoa existing and ready to be discharged in the mating process, but in a primative way, in a primative cellular way, all of the spermatozoa that would thereafter in the course of his reproductive life come to be used for reproductive purposes? A. Yes. This has some relation to my use, earlier this morning, of the word
 
 ‘
 
 cumulative/ that not only are the cells ready for discharge in the case of the male involved, but also the primordial cells or primative cells, the precursors of spermatozoa, and once these cells are affected then the cells resulting from them to produce in future time spermatozoa will be affected.
 

 “ Q. And those precursor cells or primordial cells that you refer to are present in that twenty-one-year-old young man that he will in the course of his reproductive life discharge? A. Yes, yes.
 

 “ Q. Doctor, if in the mating process when a reproductive cell, including its gene and chromosome, has been damaged by radiation, if in the mating process that joins with an ova or sperm, depending on the sex, will that visible genetic damage necessarily show in the first generation? A. No, it may not.
 

 “ Q. And it may? A. It may or it may not.
 

 “ Q. Will you explain what you mean by that? A. Well, if the mutation is one which results in what is termed in genetics a dominant type of mutation, even though the ovum or sperm, as the case may be, unites with a normal corresponding cell, the mutation will show in the first generation.
 

 ‘ ‘
 
 On the other hand if it is a recessive type of mutation, that is one which takes another one of the same type from the opposite party then this, of course, may not show up until there are enough of these mutations in the population to produce the chance of mating of an ovum and a sperm with this type of mutation present; so there is great variability here.
 

 ‘ ‘ Q. That’s right. But the visible genetic damage to offspring is possible to occur as long as the individual carrying that inherited damaged chromosome continues to be available for reproductive purposes? A. That’s right. I think you can say that as long as this abnormal chromosome or gene is present, even though it may be a recessive type, as long as it is being repro
 
 *600
 
 duced generation after generation, an abnormal individual possibly may result if a mating with a similar abnormal gene exists or takes place.
 

 “ Q. * * * I would like to ask you what chromosomes
 

 are— A. Chromosomes are —
 

 “ Q. —and I am speaking now of the reproductive cells particularly. A. Fundamentally chromosomes are the part of the cell which contains the inherent characteristics of the individual who may result from that cell.
 

 “ Q. How many chromosomes are there? A. It varies somewhat; forty-six in most individuals; some exhibiting as many as forty-eight. There are cases where there are fewer.
 

 “
 
 Q. Am I correct that in the mating process when conception occurs we have a union of, let us say, twenty-four chromosomes of one with twenty-four chromosomes of the other? A. That is correct.
 

 “ Q. Twenty-four chromosomes of the male and twenty-four chromosomes of the female? A. This is true, and perhaps if there is one abnormal in the female or in the male, then the resulting fertilized cell contains that abnormality. In other words, there is no opportunity for the corresponding partner to correct the defect.
 

 “
 
 Q. So that out of the pool it isn’t just the one chromosome, there are forty-eight of them, to make the fertilized— A. The sum of the male and female sets of chromosomes are needed to make a viable fertilized ova.
 

 ‘1
 
 Q. And when there is any one or more of those damaged or fractured chromosomes, as you said, that cannot be cured by the opposite number, that is when the visible or the genetic effect will result? A. That’s right.
 

 “ Q. Doctor, within the frame of the X-ray picture shown on Dr. Hilleboe’s Exhibit A, there are all of the twenty-four vertebral bodies, are there not? A. The entire spine is shown on this reproduction.
 

 “
 
 Q. The pelvis? A. The pelvis.
 

 “ Q. The chest bone? A. What do you mean, ‘ chest bone ’?
 

 “ Q. The sternum? A. The sternum will be hidden on a view of this sort. It doesn’t reproduce well, either on reproductions of this sort or in regular films of this sort. It usually isn’t seen well.
 

 ‘
 
 ‘
 
 Q. But in an anterior-posterior shot these X-rays have penetrated the sternum and gone through it? A. Yes, the whole chest cage has been irradiated here.
 

 “ Q. Doctor, what is the fact as to whether or not within the pelvis, the twenty-four vertebrae, the sternum and the bones
 
 *601
 
 making up the chest cage and the pelvic bones, all of the pelvic bones, as shown there, as to whether or not there is contained therein most of the marrow, most of the blood-making cells of the human body? A. There is a great deal of the blood-forming tissues located in the bone marrow included in this film.
 

 “ Q. Leukemia is cancer of the blood-forming cells of the bone, is it not? A. Yes. It is a disease, neoplastic in nature, which affects the blood-forming tissues.
 

 “
 
 The referee: Which we call cancer.
 

 “
 
 The witness: Yes.
 

 “ Q. Cancer of the- A. Blood-forming tissues.
 

 “ Q. Doctor, do you have an opinion which you can express with a reasonable degree of medical and radiological certainty as to whether or not an exposure, an X-ray exposure of 1,000 milliroentgens needed or necessary to produce a satisfactory film such as shown in defendants’ Exhibit A increases the probability of the person receiving that dosage of acquiring leukemia? A. I do.
 

 11
 
 Q. Will you state what that opinion is? * * * A. As I recall, the question is what is that opinion. The effect of radiation on biological tissues is one which not only affects the genetic elements of the reproductive organs, but also the other cells of the body, including the cells which are involved in the process of forming blood. Now, scientific evidences are perhaps not as extensive in this area as in the genetic field, yet, I think the evidence is rather conclusive on one or two points. Number 1: That radiation of the blood-forming tissues can produce leukemia. There is no question about this point in other mammals, including the mouse. In the experimental observations made of the population of Nagasaki and Hiroshima following the atomic bombs of World War II there has been an increased incidence of leukemia, an incidence of leukemia over and above that which might have been expected if there were no bombings, and that this increase in leukemia is sufficiently substantial that it has been possible for one or two scientists to have calculated what the relationship is quantitatively between radiation dose and the probability of one developing leukemia. I cite here the reports of Dr. Lewis of the California Institute of Technology and Science a few years ago who studied this problem thoroughly and who found that the probability of one’s developing leukemia was one to two parts per million per roentgen of whole body dose per year of survival after the exposure was over. And from this, one can calculate what the probabilities might be of developing leukemia after a given X-ray exposure of the whole body or substantially of the whole
 
 *602
 
 body if one assumes that the person will live from a number of years equal to the normal life span. For example, if the normal life span extends to seventy years and the individual has received his exposure at twenty this means that normally he would live another fifty years, and if one roentgen were delivered to the whole body, on the basis of Lewis’ data, this would indicate that the probability of that individual developing leukemia would be one or two parts per million multiplied by fifty, and although my mental arithmetic is not necessarily good here, I think this works out to be something of the order of one part in ten to twenty thousand. Now, this in itself, of course, is not very great, but here again it appears prudent to assume that the effects of radiation on the blood-forming tissues are cumulative and hence a number of exposures will add to the probabilities. One can calculate from them what the increased probabilities are and one should probably also from a public health standpoint assume one more thing from the standpoint of prudence, something which is not absolutely proven, but which seems entirely possible and perhaps likely, namely that the result of an exposure to radiation will be proportional to it, not only proportional to the dose given, but that there is here also no threshold dose below which no effect can be detected. As I said, the scientific evidence on this threshold proposition is incomplete, but, again, looking at the problem from a public health standpoint, it is necessary to exercise prudence and prudence requires that one assume a similar relationship, namely that there is no threshold as was the case and is the case in the genetic field. This is the answer, I think, to your question, Mr. Murphy.
 

 ‘ ‘ The referee: And these bombs over the two cities you mentioned had the effect of affecting the total bodies with X-rays of those who were within the reach of the bomb?
 

 11
 
 The witness: That is right. Technically speaking, these are not X-rays, but are similar in their effects to X-rays. X-rays, technically, are rays produced in a particular type of interaction of electrons with matter, and the radiation involved in Hiroshima and the Nagasaki bombings were not produced in precisely that way, but the radiations which were involved in Nagasaki and Hiroshima have the same effect. They were ionizing radiation, high energy radiation of the sort identically in characteristic quantitatively perhaps a little hit different, biologically identical.
 

 <c By Assistant Attorney-Gfeneral:
 

 “
 
 Q. Coming back to the final question, without reference to Exhibit A, an X-ray exposure of the full spine, including all
 
 *603
 
 those bones that I had referred to, will increase the probability of that person acquiring leukemia? A. That is correct.
 

 “
 
 Q. And as you said, the dosage is cumulative over the person’s entire lifetime and the more cumulative the dosage the more that the probability is increased? A. That’s right.
 

 “
 
 Q. Now, of necessity, that is a rather long term proposition for the purpose of visible effect as between the onset of the visible effect and the cause? A. That is right. As a matter of fact, this is characteristic of the relatively small doses which are involved here in diagnostic X-ray procedures. There are two types of radiation exposure, or at least radiation exposure may be conveniently divided into two kinds, that is large dose exposure and small dose exposure, and it is the small dose exposure with which we are concerned here.
 

 “ Q. That is right. A. In the case of large dose exposure, of course, the effects are immediate. When I speak of large doses I am speaking perhaps of hundreds and perhaps as much as thousands of Roentgens. In a small dose situation the time which takes place between radiation exposure and the demonstration of undesirable biological change may be many years.
 

 “ Q. And in the case of offspring- A. In the case of the
 

 genetic effect these don’t appear in the individual at all, but appear in the offspring or the offspring’s offspring and so on.
 

 ‘ ‘
 
 Q. Doctor, on the question of lifetime span of the individual do you have an opinion as to whether or not the exposure to dosage of 1,000 milliroentgens of the areas that we have been talking about may in effect shorten life by some period? A. I do.
 

 “
 
 Q. Will you state what that opinion is? A. Well, the scientific evidence on this point, perhaps the weakest of all of the three areas about which you have been questioning me, but there is evidence to indicate that radiation does produce shortening of the life of the irradiated individual and although one could cite data from several sources here, I will cite the data of Jones of the University of California’s radiation laboratory where he has calculated that the life shortening effect of radiation is one in which one Roentgen of whole body exposure dose shortens the life of the individual by one week. These are the data that are available at the present time.
 

 “
 
 Q. And they constitute the present scientific thinking on the subject? A. That is right.
 

 “
 
 The referee: Would you read the next to the last question back? (Whereupon the question was read by the reporter.)
 

 1 ‘ The referee: What would that mean with reference to 1,000 milliroentgen?
 

 
 *604
 
 “ The witness: Since 1,000 milliroentgens is equal to one Roentgen this would mean that a whole body dose of one Roentgen would shorten the life span of the individual by one week.
 

 “ Q. And that is a public health question, is it not ? A. I would certainly think so.
 

 “ Q. And the health and well-being of the generations yet unborn is a public health question, is it not? A. I should think so as well.
 

 “ Q. And is, in your opinion ? A. It certainly is, in my opinion.
 

 “ Q. Doctor, have you brought with you certain statistics as to the number of diagnostic X-ray examinations done at Johns Hopkins in the year ending June 30,1960 ? A. I have.
 

 “ Q. How large is that hospital? A. The Johns Hopkins has one thousand beds, plus or minus a few. I am not just certain. It also has a very large out-patient department in which at the present time an excess of twelve hundred patient visits a day are taking place.
 

 ‘£ Q. An excess of twelve hundred a day. That would approach over four hundred thousand a year. A. I would think so. I haven’t gone through the arithmetic on that.
 

 £ £ The referee: Of course, some of the patients are there longer than one day?
 

 ££ The witness: Yes. I think what Mr. Murphy was probably referring to were the out-patients who came to the clinics and, of course, would not stay overnight.
 

 <£ The referee: Were you referring to the out-patients?
 

 ££ Assistant Attorney-General: I beg your pardon, judge ?
 

 “The referee: Were you referring to the out-patients who come to the clinic and, therefore, do not stay overnight?
 

 “ Assistant Attorney-General: Yes, your Honor.
 

 “ Q. What was the total number of X-rays. A. It is in excess of 80,000 during that year period.
 

 “ Q. And this— A. This was, incidentally, X-ray examinations. There might be several films, of course, made on each examination.
 

 “ Q. And that would include the in-patient and the out-patient department? A. That is right.
 

 “ Q. Of those, how many were examinations of the cervical spine ? A. A few over fifteen hundred.
 

 “ Q. How many of the thoracic spine? A. Just under a thousand, a few over eight hundred.
 

 ‘ ‘
 
 Q. And how many of the lumbar spine ? A. A few under twenty-three hundred.
 

 £ 1 Q. Doctor, before the examination was made of the cervical spine, the thoracic spine or the lumbar spine had a physical and
 
 *605
 
 medical examination been made of that patient for the purpose of determining the existence of possible pathology in the cervical, thoracic or lumbar area? A. That is correct. No examinations are taken unless a thorough work-up of the patient has taken place beforehand.
 

 “ Q. No X-ray examinations? A. No X-ray examinations.
 

 “
 
 Q. Without a thorough work-up of the patient beforehand? A. That is right. A work-up includes a regular taking of a history and the performing of a physical examination by one of the members of the clinical staff of the hospital.
 

 ‘1 Q. And that pre-existing clinical examination had been made of all of these patients and the observation that there was a possible actual pathology in the cervical, thoracic or lumbar spine before they were X-rayed? A. This is correct. The thesis on which we operate in radiation is undesirable and hence the clinical indications for the taking of a film or series of films must be established beforehand.
 

 “ Q. Must be established to your satisfaction or the satisfaction of doctors working under you? A. To both.
 

 “ Q. To both? A. And to the doctor, of course, who has examined the patient.
 

 ‘ ‘ The referee: That makes three.
 

 ‘ ‘ The witness: That is right.
 

 ‘ ‘ Q. My arithmetic may be a little off, but actually less than three per cent of the whole sick in-patient population of a thousand beds that was changing from week to week with some going out and other going in, plus the four hundred thousand out-patient department; less than three per cent of those, as a result of scientific medical judgment, required X-ray exposure of the spine? A. Actually the percentage is somewhat lower.
 

 “
 
 Q. The lumbar spine- A. Actually the percentage is
 

 somewhat lower than this because of all the patients, the in or out-patient who come to the hospital, only about half are X-rayed, and hence, those who are not X-rayed, of course, have no lumbar spine film at all.
 

 “ Q. What proportion — withdrawn. In what proportion of those films where the cervical, thoracic or lumbar spine was X-rayed was there a subluxation found? A. I can’t give you a quantitative answer on this, but I would estimate that the number, that the incidence of this is quite rare — that is a real subluxation proven by a sufficient number of films to rule out the possibility that what might have been a subluxation is not merely a matter of the posture of the patient or the positioning of the patient by the X-ray technician.
 

 “ The referee: Would you amplify that answer, please.
 

 
 *606
 
 “ The witness: Well, your Honor-
 

 “ The referee: Not amplify it — you mean — I am not going to ask you what you mean: you tell me.
 

 “ The witness: The mobility of the joints is quite large in order that an individual can perform the many things that he does, the normal work and life, and hence, in the positioning of a patient there may be a sufficient movement in setting a patient up, of the spine let us say, so that the appearance of the spine may give the impression that one joint relative to another is not in its exact normal alinement. On the other hand, a patient may have a real subluxation which will look very much like the normal situation and then one can be certain of this situation only by taking several films in various stages of flexion and extensions to see whether or not the joint is actually abnormal or not. If the situation is fixed into a position which is abnormal and during the stages of flexion and extension normalcy is not approached, then one can be reasonably certain that a pathological state exists. But acutally under our experience subluxation, except under rather limited circumstances, is something that we are not greatly concerned about.
 

 “
 
 The referee: Would you be good enough to define subluxation.
 

 “
 
 The witness: A joint may completely dislocate in which the articular surfaces of the two bones involved in the joint are completely deranged one to the other, and in the case of a subluxation the changes in the joint and the bones associated with the joint are somewhat less than this to the extent that the relationship extends all the way from normalcy on one side to that approaching dislocation on the other side * *
 

 We now turn to the testimony of Dr. H. Bentley Glass, a geneticist.
 

 Dr. H. Bentley Glass, testified that he was a professor of biology in Johns Hopkins University; that he is a geneticist, and in particular a human geneticist. Genetics is the study of heredity and variation in all organisms from viruses through man.
 

 He is engaged in the study and research of the effect of ionizing radiation for X-ray exposure upon genetic cells and somatic cells. He studied under Professor Herman Joseph Muller who discovered that X rays will produce mutations in the hereditary material. Dr. Glass began using X rays in the study of mutations in 1929.
 

 The National Academy of Sciences’ Committee on genetic effects of radiation was appointed in 1955 and Dr. Glass was appointed secretary and has continued as such since. The
 
 *607
 
 National Academy was formed during the administration of President Lincoln to serve as a semiofficial advisory body to the Government of the United States. Election to the Academy is solely on the basis of scientific achievement and merit and is considered by American scientists to be the highest honor that can be bestowed on them in this country.
 

 Dr. Glass was shown a photograph of an X ray,
 
 anterior-posterior,
 
 exposure of the full spine including the pelvis and gonadal area. In that exposure, Dr. Glass said, the gonads in either a male or female would be in the direct primary beam of the X ray and would be irradiated (Exhibit A).
 

 Dr. Glass was then shown a photograph of the X-ray exposure contained on Exhibit D and he was asked if he was of the opinion that a
 
 lateral
 
 exposure of the full spine, including the lumbar spine, as shown, would send the direct primary beam of the X ray through the gonads of either the male or female, depending upon which would be irradiated. Dr. Glass replied that in his opinion, the gonads would be in the direct beam used in the taking of the picture. He further said that in order to obtain the satisfactory X-ray film shown in Exhibit A an X-ray dose of approximately 1,000 milliroentgens would be needed, just as Dr. Morgan had testified.
 

 Dr. Glass was then shown Exhibit D. Dr. Morgan had testified on the preceding day, that to obtain a satisfactory X-ray film of the area shown in Exhibit D — a
 
 lateral
 
 view of the full spine ■ — an X-ray dose of approximately up to 10 roentgens would be needed. Dr. Glass stated he was of the same opinion and that it would take up to 10 roentgens or 10,000 milliroentgens to obtain a satisfactory picture, and that in his opinion it would take at least up to 1,000 milliroentgens to obtain a satisfactory picture of the area shown in Exhibit A — anterior-posterior view.
 

 The gonads are the reproductive organs of the male or the female individual.
 

 In the male the testes or testicles and in the female the ovaries, contain the reproductive cells.
 

 The reproductive organs contain all of the germ cells or reproductive cells, not only the mature ones but also those that are in the immature state. It is a basic principle of biology, well established, that every cell comes from a pre-existing cell. No cells arise except from pre-existing cells and that the only living bridge between one generation and the next is through their productive cells so that all the cells of all generations still unborn must pass through the reproductive cells of this generation — now living man and woman.
 

 
 *608
 
 Dr. Glass further testified that the hereditary material of the reproductive cells, as of all cells, is located in the thread-like chromosomes of those cells, and these can be either fractured by ionizing radiations, as Dr. Morgan had described on the preceding day, or they can be made to alter in their chemical nature so as to produce permanent chemical changes in the nature of the genes, and consequently in the characterization of the offspring and descendants of any individual, arising from those mutated cells. That, in addition, all of the evidence which geneticists have obtained over the past more than 30 years in working with ionizing radiations, indicates that the frequency of chromosome breakage and the frequency of chemical mutations of the genes is directly proportionate to the size of the dose. Dr. Glass further said that in his laboratory recent experiments showed that that held down to doses as low as five roentgens.
 

 He further testified that the frequency of the mutations is directly proportionate to the dose; that that simply means that a dose of 5,000 milliroentgens would produce five times as many mutations as one of 1,000 milliroentgens and that could be carried up or down the scale of magnitudes, as one may wish; that there is no evidence that there is any dose so low that it does not produce a proportionate number of mutations and the scientific evidence is that it does.
 

 He was then asked to discribe the make-up of that genetic material and he replied:
 

 ‘ ‘ A. The genetic material in all living organisms, from viruses to man consist of nucleic acid. Do you want further details
 
 1
 

 “
 
 Q. (By the Attorney-General): What I am endeavoring to elicit is a physical description of the cellular set-up by way of genes and chromosomes, &c. A. Yes. I have already stated that the hereditary material is located within chromosomes which are found in the nucleus of each cell. In the human cell there are characteristically forty-six of these chromosomes; in the reproductive cells only twenty-three of the forty-six which are present in the body cells, and in the immature germ cells twenty-three are transferred to the original fertilized egg from which all the other cells come, through the maternal parent, and twenty-three derived through the paternal parent, one set through the ovum, the other set through the spermatozoa; so that for every chromosome derived from the mother there is a corresponding chromosome derived from the father. The hereditary units or genes are arrayed in a linear series along these chromosomes,
 
 *609
 
 many hundreds, or even thousands of genes making up any one chromosome, and so it also follows that for every gene inherited from the mother of an individual there is a corresponding gene inherited from the father of the individual.
 

 “
 
 The referee: Twenty-three from each?
 

 ‘ ‘ The witness: Twenty-three pairs of chromosomes, yes; twenty-three chromosomes from each.
 

 “ The referee: From each parent?
 

 “
 
 The witness: Yes.
 

 “
 
 The referee: One word was used here yesterday by Dr. Morgan, and again today by you, which intrigues me; and that is you talk about the ‘ fracture ’ of a chromosome.
 

 “
 
 The witness: Yes, sir.
 

 “ The referee: The layman or woman thinks of a'fracture as a fracture of a bone.
 

 “
 
 The witness: This is precisely why we use the word, your Honor.
 

 “
 
 The referee: In other words, a chromosome is a bony substance ?
 

 “ The witness: No, no, but it has a linear integrity like a thread and it can be broken just like a thread, and I have photor graphs which show the effects of such breaks produced by ionizing radiation.
 

 11
 
 The referee: And such a break you have referred to as a fracture ?
 

 “ The witness: Yes.
 

 ‘1
 
 The referee: And, Dr. Morgan, you heard him testify yesterday, he used the word ‘ fracture ’ and that was with reference to the breaking of this substance which is like a thread, it is linear ?
 

 “ The witness: That’s correct, your Honor.
 

 u
 
 rphg referee: Proceed.
 

 ‘
 
 ‘ By Assistant Attorney-General:
 

 “
 
 Q. Doctor, you have testified that the cells of the body, the somatic cells such as might appear in a person’s hand or in his kidneys, or in his heart, et cetera, are made up of forty-eight chromosomes; is that correct? A. Forty-six.
 

 “ Q. Whereas the single ovum that is about to be fertilized by a sperm is made up of how many? A. Contains twenty-three choromosomes.
 

 ‘
 
 ‘
 
 Q. And in the mating process the sperm cell of the male that unites with that ova to fertilize it to form the number one human
 
 *610
 
 cell, contains how many chromosomes? A. The spermatozoan also contains twenty-three chromosomes.
 

 ‘ ‘ Q. And added together it makes up the forty-six chromosomes of the original primitive cell? A. That’s correct.
 

 ‘ ‘ Q. And that is what happens at conception, the instant of conception. A. That’s correct.
 

 “
 
 Q. Then, almost instantaneously, that single cell begins its divisive process to go on to form over the course of approximately the next nine months the human being that is to be born? A. Yes. Every time a cell divides this is preceded by the reproduction of replication, as geneticists call the process, of the chromosomes; and then one duplicate of each chromosome goes to each daughter cell, so that when the original fertilized egg has forty-six chromosomes each daughter cell will have forty-six chromosomes, identical with those that were in the original fertilized egg cell; and if a fractured chromosome or a mutated gene is present in one of the chromosomes of the fertilized egg cell either coming from the ovum or coming from the sperm, it will be replicated and transferred to all of the cells of the body of the offspring, including the prospective reproductive cells which would be used in the next generation.
 

 “ Q. One of the effects of X-ray exposure is to cause mutated genes — produce mutated genes ? A. It will produce both the fractures of the chromosomes and the mutations of the genes. Generally, the fractures of the chromosomes are more drastic in their immediate effects than the mutations of the genes. They often kill the cells in which the fractures occur, so that these cells are not responsible for defects in future generations. But the mutated genes have less immediate effects upon the lives of the cells, and consequently are transmitted to further generations of individuals.
 

 ‘1 Q. What you are saying is not only true of the cells making up the gonads and the hereditary materials, but also the somatic cells peripherally in all the rest of the body? A. It applies to all of the cells.
 

 ‘ ‘ Q. Dr. Glass, in your opinion, is it a fact that there is no ■minimnm or minimal amount of radiation which must be exceeded before mutations occur? A. All of the scientific evidence we have indicates that there is no minimal dose which must be exceeded before mutations are produced. The linear proportionality or direct proportionality, according to dose, extends down, so far as our evidence goes, to the effects of a single packet of energy which may be absorbed by a chromosome.
 

 “ Q. And that single packet of energy might be a single photon? A. A single photon.
 

 
 *611
 

 ‘ ‘
 
 Q. And a well working X-ray machine is sending out through the window of the machine millions and myriads of photons to take a satisfactory picture; is that correct? A. Millions is an inadequate word to express the number.
 

 <£ Q. Myriads? A. Yes, billions and billions, and billions.
 

 ££ Q. To produce the satisfactory X-ray picture that would be needed to get a clear picture of Exhibit A or Exhibit D ? A. That is correct.
 

 £
 
 1
 
 Q. Do you have an opinion as to whether or not the genetic and somatic cellular damage from X-ray exposure is cumulative and additive? A. I do.
 

 ££ Q. What is that opinion? A. It is both cumulative and additive. All of the experiments that I have conducted personally and that other geneticists have conducted, according to my knowledge, have indicated that all of the radiation, the ionizing radiation received by the reproductive cells during the course of a generation up to the termination of the reproductive period is additive and cumulative.
 

 ££ Q. That is, that the X-ray exposure taken to-day must be added to the one taken next month plus the one three months later, plus the one a year later, plus the one five years later, and so on? A. Exactly.
 

 “ Q. And prescinding, for the purposes of this question, away from the hereditary material, would your opinion be the same as to the additive and the cumulative effect of X-ray exposure on the somatic cells in all the rest of the body? A. So long as that is referred to the chromosomes, the hereditary material of the other cells, it does so apply.
 

 ££ Q. Do you have an opinion as to whether or not, as far as the total general population is concerned — in the State of New York it is roughly sixteen million, plus or minus — in the long run a little radiation to a lot of people is as harmful as a lot of radiation to a lesser number; do you have such an option?
 

 £ ‘ The witness: I wrote that sentence myself, in the report to the National Academy of Sciences Committee. It is my opinion.
 

 “
 
 By Assistant Attorney-General.
 

 ££ Q. Was it your opinion when you incorporated it there? A. Yes.
 

 ££ Q. And is it your opinion to-day? A. It is my opinion to-day.
 

 £ £ The referee: Counsel used the word £ somatic ’ in one or two or more questions.
 

 The witness: Yes, your Honor.
 

 ££ The referee: What do you mean by ££ somatic? ”
 

 
 *612
 
 “ The witness: ‘ Somatic ’ is to distinguish cells and tissues and organs from reproductive. It refers to all parts of the body which are not the reproductive organs and the reproductive cells.
 

 “ Q. Dr. Glass, these damaged or fractured chromosomes are visible under a microscope, are they not? A. They are.
 

 “ Q. And you have seen them? A. Yes.
 

 “ Q. You have testified that when the reproductive cells are damaged by irradiation, mutated genes result? A. That is correct.
 

 “ Q. Is it your opinion that once that gene mutates it remains permanently altered? A. It remains permanently altered, barring the extremely rare possibility of its mutating back again. This is — this reverse mutation is an event that occurs with extreme rarity.
 

 “
 
 Q. Doctor, what happens then, if in the master plan a male sperm cell that has been damaged by mutation from X-ray exposure unites with a female ovum in the reproduction process? A. Theoretically all mutations, an overwhelming majority of them, produce damage. This damage may be evident in the immediate offspring or only in subsequent generations, even to the fortieth, or later, generation. The types of damage which may arise can affect virtually any part or system of the body. These might include: Mental or nervous defects and disorders, such as epilepsy, for example; neuromuscular disorders; defects of vision or hearing, such as deafness; defects in the growth of the skeletal system, such as dwarfness; defects of a hematological kind, such as inability of the blood to clot properly; or endocrine disorders, such as diabetes, or modifications; congenital deformities and defects of the heart, of the digestive tract, or of the urinary and genital organs. Everything can be covered. This is because the genes control the pattern of normal development— the master plan, as you called it, of development is in the gene. When a gene is mutated it is unable to perform its normal function either entirely or partly.
 

 “ Q. Does the same thing that you have testified to happen if in the master plan a female ovum unites with a male sperm that has been damaged by X-ray exposure if such union occurs in the mating process ? A. If I understand your question, you ask whether you will get the same kind of damage whether the defect is produced in the ovum or in the sperm?
 

 “ Q. Yes. A. And the answer is ‘ essentially yes.’ If, however, the damage is done in the ovum there is a slightly higher probability that the defects will be manifested in the immediate offspring of the irradiated ovum, because there are sex-linked genes that male offspring inherit from their mother and not from
 
 *613
 
 their father that can show up in the next generation. Hemophilia, or failure of the blood to clot properly, is an example of such a defect.
 

 “ Q. Doctor, even though in the case of the damaged male cell, which you have testified to as producing its consequent damaging effect in the immediate generation, should by chance in the master plan that damage not show up in the sons or daughters of that person, that does not mean that the damage is not being carried on to the grandchildren and great grandchildren, does it? In other words, it doesn’t stop at the first generation? A. Geneticists speak of what we call dominant hereditary defects, examples being dwarfness, misshapen dwarfness, and six-fingerness, and of recessive defects which require that before the trait is clearly manifested it must be inherited both from the father and from the mother. The dominant characteristics will be manifested in the immediate generation after the mutation occurs. The recessive ones will not be manifested perhaps for many generations. But each type in the end does just as much harm to the population, because no defective gene is eliminated from the population unless when it becomes manifested in some individual who is then harmed by it and may be prevented from passing it to the next generation-
 

 ‘1 Q. One more question, doctor: Do you have an opinion which you can express with a reasonable degree of certainty as to whether or not an X-ray exposure of approximately one thousand milliroentgens to the human body, to the full spine and lumbar area, increases the probability of the person receiving that dosage of getting leukemia — increases the probability? A. Ido.
 

 ‘1 Q. Will you state what the opinion is ? * * *.
 

 “ By Assistant Attorney-General:
 

 “ Q. Just state whether the opinion is that it can or cannot. A. It can increase the probability.”
 

 Dr. Herman E. Hilleboe is the Health Commissioner of the State of New York. He testified at length. He is the defendant herein and his testimony was in accord with that of Dr. Morgan and Dr. Glass. I shall rest upon that without digesting Dr. Hilleboe’s testimony since this opinion is already quite lengthy. I shall merely add that Dr. Hilleboe testified that the stethescope, the sphygmomanometer, the ophthalmoscope and the otoscope “are instruments of medical practice” and that an X-ray machine is “an instrumentality of medical practice” (s. m. 847-850). I find as facts those statements of Dr. Hilleboe as to the instruments mentioned.
 

 
 *614
 
 A word should he said at this point in this opinion about the case of
 
 Matter of Sausser
 
 v.
 
 Department of Health
 
 (242 N. Y. 66, 69) upon which plaintiffs so heavily rely. That was a case which involved a regulation adopted by the Board of Health supplementary to a provision of the Sanitary Code of the City of New York, section 107. The case was decided in 1926 and was applicable to the City of New York only. Three words had been inserted in that regulation of the Board of Health. Those three words were “ or other person.” It was a different world in which we were living in 1926 from the one in which we lived in, in 1950. We had learned of mutation of the genes by X ray, beginning in 1930. We had learned of atom bombs by 1945, so on October 9,1950, we amended section 107 of the Sanitary Code of the City of New York and the regulation of the Board of Health accompanying section 107. We amended the regulation so that it read: “ Every X-ray laboratory * * * shall at all times be in charge of and under the direction of a duly licensed physician or other person who is licensed under the laws of this .state to diagnose and treat disease * *
 

 Chiropractors have never been licensed under the laws of this State to diagnose and treat disease either in the City of New York, to which section 107 of the Sanitary Code and the accompanying regulation applied, or in the State of New York (see
 
 People
 
 v.
 
 Blanchard,
 
 288 N. Y. 145, 147, 148).
 

 Later, at a meeting of the Board of Health of the Department of Health of .the City of New York, held on March 19, 1958, section 107 of the Sanitary Code of the City of New York and the regulations governing the conduct and maintenance of X-ray laboratories in the City of New York and relating to section 107 of the Sanitary Code of the City of New York as last amended by resolution adopted on October 9, 1950, were repealed. The Sanitary Code of the City of New York was then amended by adding thereto a new article to follow article 5 and to be article 6.
 

 When we turn to the resolution of the Board of Health of the Department of Health of the City of New York which was adopted on March 23, 1959, we find that it opens in the first paragraph with the following resolution: “Besolved, that the Sanitary
 

 Code of the City of New York and all regulations relating to any and all provisions of said Sanitary Code, heretofore adopted by the Board of Health of the Department of Health of the City of New York, be and the same are hereby repealed, except * * * ” for certain sections not here material.
 

 In the edition of the New York City Health Code in the volume prepared under the direction of the Board of Health of the City of New York by the legislative drafting research fund of
 
 *615
 
 Columbia University, which appears to be the official publication of the New York City Health Code, there are certain introductory notes. On page 9 we find the following paragraph: “ The revised Code contains another innovation. It has been prepared as an annotated code, in which each section is followed by a revisors’ note containing the derivation of the section and legal and other pertinent references. It should be noted that these revisors’ notes were before the Board of Health when it enacted the provisions of the New York City Health Code, and accordingly these notes may properly be used as an aid in the construction of provisions of the Code whenever such construction is necessary.”
 

 There are further introductory notes on page 401 under article 175 entitled
 
 “
 
 Radiological Hazards.” I shall now quote from those introductory notes the first four paragraphs. They read as follows:
 

 “ Article 175 aims to protect the public generally, as well as workers in certain installations, from the dangers inherent in the uncontrolled use of ionizing radiation. The article is intended to serve, also, as a framework for coordination of activities with the United States Atomic Energy Commission (principally with its New York Operations Office), the State Department of Labor which administers Industrial Code Rule 38, the State Health Department which administers Chapter XVI of the State Sanitary Code, the Governor’s adviser and co-ordinator on atomic energy matters, and with other state and federal agencies.
 

 ‘
 
 ‘
 
 Although this article is derived without major substantive change from Article 6 of the Sanitary Code, it should be noted that Article 6 was prepared as part of the 1955-1959 revision but was enacted on March 19,1958, in order to give an early start to the City radiation program. Until January 22, 1958, the only regulation of this field consisted of S. C. section 107 and regulations which placed under permit and regulated X-ray laboratories and S. C. section 107a which placed under permit and regulated shoe fitting fluoroscopy. On January 22, 1958, S. C. section 107a was repealed and re-enacted. The re-enactment contained the substance of what is now section 175.17. It provided that no person was to apply ionizing radiation to a human being unless he himself was or was acting under the direction of a person licensed to practice medicine, dentistry, podiatry or osteopathy; and no person could sell X-ray or fluoroscopic equipment except to such authorized persons (and to certain institutions). This provision not only banned shoe fitting fluoroscopy
 
 but also banned use of X-ray-equipment by chiropractors.
 
 The
 
 *616
 
 regulations under the earlier version of S. 0. section 107a were repealed. (Emphasis supplied.)
 

 “
 
 On March 19,1958, Article 6 was enacted and both S. 0. section 107 and regulations (governing X-ray laboratories) and the new S. 0. section 107a (which were incorporated into article 6) were repealed.
 

 “
 
 Article 175 is based primarily on provisions contained in Chapter XVI of the State Sanitary Code, on provisions contained in Buie 38 of the State Industrial Code, on recommendations of the National Committee on Badiation Protection and Measurements (N. C. B. P.), and on pertinent regulations of the Atomic Energy Commission as contained in title 10 of the Code of Federal Begulations, Parts 20 and 30. Additional provisions concerning the reporting of radiation accidents, illness and losses were developed after consultation with officials of the City Police and Fire Departments.”
 

 Turning then to section 175.17 I quote paragraphs (a) and (b) as follows:
 

 “ (a) No person shall apply ionizing radiation to a human being unless he is licensed or is otherwise authorized to practice medicine, dentistry, podiatry or osteopathy pursuant to the Education Law, or, as technician, nurse or other assistant is acting under the supervision of such licensed or authorized person. No person authorized by this subsection to apply ionizing radiation shall apply such radiation except to those parts of the human body specified in the law under which such person or his supervisor is licensed or authorized to diagnose and treat.
 

 “ (b) No person shall sell, lease, transfer or lend X-ray or fluoroscopic equipment or the supplies used in connection with such equipment other than to (1) persons specified in subsection (a) of this section and (2) to hospitals, infirmaries, medical, dental and podiatry schools, institutes, sanatoriums, clinics, and laboratories supervised by persons specified in subsection (a) of this section. This subsection does not prohibit dispositions of such materials and supplies to persons intending to use the same for the application of ionizing radiation otherwise than to human beings, nor to the acquisition of such equipment or supplies by wholesalers, distributors or retailers in the regular course of their trade or business. ’ ’
 

 The first paragraph of notes following section 175.17 reads as follows:
 

 “ Notes: Subsections (a) and (b) are derived without substantive change from S. O. sec. 83. Subsection (e) is new. Shoe fitting fluoroscopy is prohibited by this article unless conducted by or under supervision of a physician or other specified licensed
 

 
 *617
 
 professional person. The section does not change the requirements of former S. C. section 107 and regulations in limiting the taking or diagnosing of X-rays to licensed physicians and other persons licensed to diagnose or treat disease. The section parallels, without substantive difference, a new amendment to the state Sanitary Code, chapter XVI, regulation 19. The Attorney-General, in a letter opinion to the State Commissioner of Health, dated May 29,1957, stated, ‘ * * * new regulation 19 in Chapter XVI appears not to be unconstitutional as a subject to be included in the Sanitary Code and not unreasonable in content. ’ Note that the opinion of the Attorney-General did not refer to the case of
 
 Sausser
 
 v.
 
 Department of Health,
 
 242 N. Y. 66, 150 N. E. 581 (1926) wherein the Court of Appeals, interpreting an earlier version of S. C., section 107, directed the issuance of a permit to operate an X-ray laboratory to a chiropractor. The case, inferentially, raises the question whether the taking of X-rays constitutes the practice of medicine. In the light of recent knowledge concerning radiological health hazards, the
 
 Sausser
 
 case may well be obsolete.”
 

 The State Attorney-General did not of course, refer to
 
 Matter of Sausser
 
 v.
 
 The Department of Health (supra)
 
 because: (1) It was obsolete since, as we have seen, that case was applicable only to a regulation of the Board of Health of the City of New York accompanying section 107 of the Sanitary Code of the City of New York only as it existed in 1926 and (2) it was never applicable to the Sanitary Code of the State of New York, Chapter XVI, regulation 1 or regulation 19.
 

 Complaint dismissed, with costs. Attempted stipulation, staying the enforcement of Chapter XVI, regulation 19, of the Sanitary Code of the State of New York, by the attorney for the defendant vacated and motion to dismiss the separate defenses of the defendant denied.